Filed 4/17/14  Certified for publication 5/13/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re ISABELLA F., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. Y.M., Defendant and Appellant. | A139220 (Sonoma County Super. Ct. No. 4130-DEP) |

Appellant Y.M. (mother) challenges the juvenile court's order declaring jurisdiction over her daughter, Isabella F., finding that Isabella suffered serious physical harm and faced a substantial risk of further harm, and adjudging Isabella a dependent minor.  (Welf. & Inst. Code, § 300, subds. (a), (b).)[1]  Mother contends that the record lacks substantial evidence supporting the court's jurisdictional findings.  We agree and therefore reverse.

---

[1] All statutory references are to the Welfare and Institutions Code.

1

# I.
## FACTUAL AND PROCEDURAL
### BACKGROUND

Isabella was born in May 2003 and has two older siblings, one of whom currently lives in the home with Isabella and mother and is not the subject of these proceedings. Isabella's father, David F. (father), does not live in the home, is apparently uninvolved in Isabella's life, and likewise is not a party to this appeal.[2]

The current proceedings were initiated after an altercation between mother and Isabella on the morning of February 27, 2013.[3] Isabella had argued with her older brother about money he had given her to buy hot chocolate at school. Though the record contains different accounts of the altercation, it is clear that mother became physical with Isabella after Isabella resisted getting ready for school. Once at school, Isabella cried and reported that mother hit her in the face, grabbed her by the neck, and locked her in the bathroom. School personnel were familiar with Isabella, who reportedly was chronically truant and complained to her school office almost daily about headaches and stomach aches, and staff believed Isabella's problems at school were related to her troubled home environment. Isabella told a social worker that she was afraid of mother. A social worker reported that Isabella had scratches, consistent with fingernail scratches, on one side of her face and had a gouge mark on her left ear lobe consistent with a fingernail injury. Photographs were taken of the injuries, and they show the gouge mark and what

---

[2] Isabella was born five years after mother and father separated, father has not been caring for their children, and father does not have contact with the children. Isabella told a social worker that she did not know where father was, and she had not seen him "in a long time." Mother does not have father's current address or telephone number. Although father was declared Isabella's presumed father in these proceedings, the Department's efforts to contact him were unavailing.

[3] All further date references are to the 2013 calendar year unless otherwise specified.

appears to be a small cut on Isabella's cheekbone and discoloration around the cut, but they do not clearly depict significant injuries.[4]

When a social worker tried to discuss the incident with mother the same day, mother's speech seemed "pressured and her thinking tangential," and mother immediately informed the social worker that she "has a legal right to spank her child if she wants to." Mother admitted holding Isabella down and trying to spank her but denied hitting her in the face. When mother spoke with a social worker later, she explained that Isabella was having a "really bad tantrum" the morning of the altercation, and she tried to pull Isabella into the bathroom to calm her down. She told the social worker, "I would never intentionally hurt her and I don't understand how she got those marks as I don't even have long nails. If I did scratch her, it was an accident because I would never leave marks on my children intentionally." She also acknowledged that she should have taken another approach to the situation and simply "walked out."

The day after the incident, February 28, the Department filed a dependency petition alleging that Isabella had suffered serious physical harm (§ 300, subd. (a)) from mother's physical assault. The petition further alleged that there was a substantial risk that Isabella would suffer additional serious physical harm (§ 300, subd. (b)), based on father's mental-health issues.[5] Isabella was detained in shelter care.

A team decision-making meeting was held the same day the petition was filed. Mother, Isabella's two older siblings, the principal of Isabella's school, representatives from an Indian tribe to which mother belongs, and two social workers attended. One of the social workers was "very impressed at the way the entire community rallied around this family" and reported that the meeting's participants determined that "this family is

---

[4] Black-and-white copies of poor quality appear in the clerk's transcript on appeal. Concerned that the photos might not reveal the full extent of any harm Isabella suffered, we requested color copies, which the juvenile court transferred to this court for our review. (Cal. Rules of Court, rule 8.224(d).)

[5] Father reportedly has mental disorders, including schizophrenia and paranoia, and he was apparently placed on an involuntary psychiatric hold in October 2010, more than two years before the dependency petition was filed.

under a lot of pressure and they have been for a long time" because of "financial stressors" and "mental health stressors."

Based on the team meeting, the Department reported at the detention hearing the following day that it had changed its position and requested that the case would proceed with Isabella remaining with mother. Both county counsel and a social worker assigned to the case told the juvenile court that Isabella would be at greater risk of harm if she was removed from mother's custody than if she remained placed with her. County counsel acknowledged that this was a serious case and that mother had not been sufficiently responsive to voluntary services, but suggested that initiating dependency proceedings would be a "stick as opposed to a carrot" to motivate mother to comply, and that this approach was expected "to make the difference for this family."[6] The social worker likewise believed that a "voluntary case" could not address the family's issues "both from a financial aspect and from having the authority to provide those services" the family needed. A tribal representative also recommended that Isabella be returned to mother and stated that the tribe would help the family. Mother's counsel submitted the matter after noting that a transition from voluntary services to court intervention was "an upgrade, and I think the services available are different because of funding or lack thereof." Over the objection of Isabella's attorney, the juvenile court declined to detain Isabella and

---

[6] The comments about voluntary services and the "carrot" approach were a reference to the Department's prior involvement with this family. Mother and Isabella have had a history of problems relating to or affecting Isabella's school attendance. The Department had received several referrals about the family that were closed without services being provided. But in February 2011, the Department substantiated a report that mother was neglecting Isabella and her older sister and opened a voluntary family maintenance case. Services were provided, including counseling and parent education. The case was closed after one year because the time limit for providing services was reached. When the case was closed, the social worker wrote in her closing summary that mother did not appear to be a good candidate for additional voluntary services in the event of another referral because she was "selective in what she [was] willing to do and was not willing to engage with learning positive parenting skills." (Boldface omitted.) Mother also continued to struggle with getting Isabella to attend school.

4

instead ordered out-of-custody detention, meaning that Isabella would be returned to mother under court supervision, with mother participating in services.

Two weeks later, a social worker interviewed Isabella at school, and Isabella appeared to be in good spirits. She told the social worker that the February 27 incident was the first time anything like that had happened, that she did not think mother wanted to hurt her because "normally she just yells," that she was not afraid of mother, and that she thought mother had "learned her lesson and it won't happen again." Isabella was participating in individual therapy and working on her feelings about not wanting to attend school. She was scared about the possibility of being removed from mother's care and was hopeful it would not happen again.

Mother, meanwhile, had begun anger-management classes, was reading books on how to better deal with children who are defiant, and was participating in weekly individual therapy. She had sought out resources voluntarily from the Sonoma County Indian Health Department and acknowledged needing help managing her emotions. Although mother sometimes appeared to others to be defensive, she agreed to comply with services and said she would not use any form of physical punishment.

The Department recommended in its jurisdiction report filed on March 29 that the juvenile court sustain the dependency petition, that Isabella remain in mother's care, and that the court order maintenance services. The social worker believed that Isabella was currently safe in mother's care given her engagement in services and her demonstrated willingness to cooperate with the Department. The social worker considered mother to be "passionately committed towards [her daughter's] needs and very resourceful," she was "genuinely invested in working with several providers in order to ensure that she will not utilize any form of physical punishment with the minor," and several providers also confirmed mother's commitment toward Isabella.

The parties agreed to a settlement conference, but they were unable to reach a resolution. Mother then requested a contested jurisdictional/dispositional hearing, and one was held on May 20. Mother was the sole witness, and she provided additional testimony about the February 27 incident. She testified that Isabella was procrastinating

instead of getting ready for school, and at some point it became clear that Isabella was going to miss the bus to school. Isabella then began to bicker with her brother, who wanted his hot-chocolate money back from Isabella because Isabella was not going to make it to school in time to buy the treat. Mother said that Isabella then "went into a total meltdown," throwing things at the living room wall, taking off her clothes, and getting back into bed. Mother thought Isabella likely was upset about school-related issues unrelated to the money for hot chocolate. Mother stated that she was upset with Isabella because they had previously struggled about Isabella missing school. Mother tried to put Isabella over her knee and spank her, but Isabella's size made it difficult. Mother picked up Isabella, took her to the bathroom, and told her she needed to put water on her face. Mother eventually took Isabella to school, and on the way Isabella complained she was bleeding. Mother testified she was not aware there were marks or scratches on Isabella's face before she went to school, and she explained that Isabella "kept pulling it [where she said she had a mark], and she was like digging her nail in it. She likes to pick scabs sometimes." Mother admitted she had spanked Isabella on the bottom in the past, but "not like that kind of situation at all," which was an isolated incident. Mother acknowledged that she did not handle the incident with her daughter in the best way possible and that she could use support dealing with anger management. Mother said she was not blaming Isabella for what happened and that she took responsibility for the incident. She testified that the services she had received so far had helped, and she would continue to work on becoming a better parent.

Mother's counsel acknowledged that Isabella had sustained injuries but argued that the Department had not proved that she suffered serious physical harm as defined by section 300, subdivision (a). But counsel stopped short of asking the juvenile court to dismiss the petition, apparently based on mother's desire to receive services. Counsel concluded: "We are not here to ask that this case not move forward in a dependency situation. My client wants the help. So I would invite the Court to either find the petition not true in regards to the (a) count but find the petition true in regards to the (b) count

6

[relating solely to father] and take jurisdiction and proceed to disposition of family maintenance.  Or I would ask that the Court amend its findings according to proof."

The juvenile court stated it was "good news" that mother had "a lot of insight into what the situation is."  It nonetheless sustained the petition, focusing on the benefits of reunification services, as opposed to any harm Isabella had suffered:  "There are several ironies I want to bring to your attention.  For instance, if the Court were to say, 'Well, none of this happened, and I'm just going to dismiss everything,' and you walk out of here, then you would be in a situation where you would not be getting the services that you, yourself, have asked for and you, yourself, have identified as being beneficial for your child.  So it would be very difficult for the Court to put your child in a situation where they [services] would be deprived.  And, in fact, you have not asked that we do that.  [¶] So the Court is going to find that it does have jurisdiction."  The juvenile court adjudged the minor a dependent child and placed her with mother under the Department's supervision.[7]

This timely appeal followed.

## II.
### DISCUSSION

### A.  Mother Adequately Preserved Her Right to Challenge the Juvenile Court's Order.

Before examining mother's challenge to the sufficiency of the evidence, we first consider the Department's argument that mother cannot challenge the jurisdictional findings because her attorney asked the juvenile court to take jurisdiction under section 300, subdivision (b), thereby barring her appellate arguments under theories of forfeiture and invited error.  We cannot agree.

A reviewing court ordinarily will not consider a challenge to a lower court's ruling if an objection could have been, but was not, made below.  (*In re S.B.* (2004) 32 Cal.4th

---

[7] The court also found that the Indian Child Welfare Act of 1979 (25 U.S.C.A. § 1901 et seq.) applied, based on mother's enrollment in an Indian tribe.  A tribal representative appeared and spoke at the contested hearing.

1287, 1293.) This rule is applicable in dependency matters, and its purpose is to encourage parties to bring errors to the attention of the juvenile court so that they may be corrected. (*Ibid.*) But here, mother preserved her right to challenge the sufficiency of the evidence supporting the juvenile court's orders by requesting a contested jurisdictional/dispositional hearing after the parties were unable to reach a negotiated resolution. "Sufficiency of the evidence has always been viewed as a question necessarily and inherently raised in every contested trial of any issue of fact, and requiring no further steps by the aggrieved party to be preserved for appeal." (*In re K.F.* (2009) 173 Cal.App.4th 655, 660; see also *In re Erik P.* (2002) 104 Cal.App.4th 395, 399-400 [no waiver of challenge to sufficiency of evidence supporting juvenile court's finding that minor was adoptable].) It would improperly weaken the Department's burden of establishing jurisdiction by a preponderance of the evidence to hold that challenges to the juvenile court's findings could so easily be forfeited. (*Erik P.*, at p. 400.)

It is true that mother's counsel asked during argument that the juvenile court take jurisdiction under section 300, subdivision (b)—based on allegations related *solely to father*. It is clear from the record that counsel took this step as a way to secure reunification services for mother, who acknowledged that she would benefit from them. We agree with mother, however, that her counsel's request did not amount to, and should not be construed as, a personal admission of the allegations of the petition, as required

under California Rules of Court, rule 5.682(d)-(e).[8] (*In re Monique T.* (1992) 2 Cal.App.4th 1372, 1376-1377 [error to accept counsel's waiver of right to contested jurisdictional hearing without explaining rights to mother and accepting her personal waiver].)

Finally, we would exercise our discretion and consider mother's argument even if we were to conclude that she had forfeited the issue below. We would do so because this case presents the important legal issue whether a juvenile court may take jurisdiction over a minor in order to provide a parent services when insufficient evidence supports the jurisdictional order. (*In re S.B.*, *supra*, 32 Cal.4th at p. 1293.)

This case is distinguishable from *In re N.M.*, *supra*, 197 Cal.App.4th 159, upon which the Department relies. In *N.M.*, the parent and the social services agency reached a settlement before a scheduled jurisdictional/dispositional hearing whereby the agency agreed to amend the allegations of the original dependency petition, and the father agreed to deal with physical-abuse issues in therapy. (*Id.* at p. 164.) *N.M.* held that the father's agreement to deal with abuse issues in therapy was akin to an admission, because there would be no need for therapy if the court was not going to take jurisdiction. (*Id.* at p. 167.) The negotiated settlement was "essentially a contract" under which the father implicitly waived his right to challenge the court's jurisdictional finding. (*Ibid.*) Here, we seriously doubt that mother could admit, either implicitly or explicitly, allegations directed solely to an absentee parent. And, more importantly, the parties here were *not*

---

[8] California Rules of Court, rule 5.682(e) provides that at a jurisdictional hearing, a parent may elect to (1) admit the petition's allegations, (2) plead no contest, or (3) submit the jurisdictional determination to the court based on the information provided to the court and waive further jurisdictional hearing. A parent's admission (option one) must be made personally. (Rule 5.682(d).) Even where a parent submits a jurisdictional determination on information provided to the court in the social services agency's report (option three), which was not the case here because mother presented additional evidence in the form of her testimony, the juvenile court is still required to weigh evidence, make evidentiary findings, and apply relevant law to determine whether the case has been proved. (*In re Tommy E.* (1992) 7 Cal.App.4th 1234, 1237.) In such circumstances, the parent does not waive the right to challenge the sufficiency of the evidence to support the juvenile court's jurisdictional finding. (*In re N.M.* (2011) 197 Cal.App.4th 159, 167.)

able to reach a negotiated settlement as they were in *N.M.* Under these circumstances, mother did not forfeit her evidentiary challenge to the juvenile court's order.

### B. *The Standard of Review.*

In dependency proceedings, the social services agency has the burden to prove by a preponderance of the evidence that the minor who is the subject of the dependency petition comes under the juvenile court's jurisdiction. (§ 355, subd. (a); *In re N.M.*, *supra*, 197 Cal.App.4th at p. 168.) We review the jurisdictional findings for substantial evidence. (*In re James R.* (2009) 176 Cal.App.4th 129, 134-135.) We consider the entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding. (*Id.* at p. 135.) We do not consider the credibility of witnesses or reweigh the evidence. (*Ibid.*) Substantial evidence does not mean "any evidence," however, and we ultimately consider whether a reasonable trier of fact would make the challenged ruling in light of the entire record. (*Ibid.*) The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order. (*In re N.M.*, at p. 168.)

### C. *The Record Does Not Show that Isabella Suffered "Serious Physical Harm," as Defined by Section 300, Subdivision (a).*

Having determined that mother has properly preserved her ability to challenge the sufficiency of the evidence, and with the applicable standard of review in mind, we turn to the core of mother's argument that there was insufficient evidence to support the juvenile court's jurisdictional finding under section 300, subdivision (a). The subdivision authorizes jurisdiction if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." The court may find a substantial risk of future injury "based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm." (*Ibid.*) "[R]easonable and age-appropriate spanking to the buttocks where there is no evidence of serious physical injury" is not considered "serious physical harm" for

10

purposes of the subdivision. (*Ibid.*) A juvenile court need not wait until a child is seriously abused or injured before it takes jurisdiction under section 300, subdivision (a), and the court may consider past events in deciding whether a child currently needs its protection. (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 165.)

Here, it is essentially undisputed that mother failed to interact appropriately with Isabella on the morning of February 27 and that mother would benefit from services related to anger management. But the evidence in the record before us does not support a finding that Isabella's injuries amounted to "serious physical harm" under section 300, subdivision (a). Although the statute does not define what constitutes such harm, it has withstood a void-for-vagueness challenge because the term has a sufficiently well-established meaning and is no less specific than the phrase "great bodily injury." (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 436-437.) "Although there may be an 'I know it when I see it' component to this factual determination [of what constitutes 'serious physical harm'], as with the term 'great bodily injury' we believe that parents of common intelligence can discern what injuries fall within its reach." (*Id.* at p. 438.) We conclude that Isabella's harm fell outside the statute's reach. (Cf. *ibid.* [mother punished three-year-old child by striking him on stomach and forearms with a belt, leaving deep, purple bruises]; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433 [father struck daughter with sufficient force that he dislocated her shoulder]; *In re David H.* (2008) 165 Cal.App.4th 1626, 1645 [mother beat son with belt and electrical cord, hitting him seven times on each of three occasions and causing bruises, linear red marks, welts, and broken skin].)

We recognize that section 300, subdivision (a) may apply when a minor suffers less serious injuries but there is a history of repeated abuse. (*In re N.M.*, *supra*, 197 Cal.App.4th at pp. 162-163, 169 [although father did not injure daughter when he started to drive away while girl was reaching into truck's cargo area, incident was part of larger pattern of physical abuse].) But that is not the case here, where Isabella reported this was an isolated incident, and there is nothing in the record to suggest otherwise. It is true that when the Department closed the prior, voluntary case in March 2012, the social worker reported that "the physical violence between mother and [Isabella's older brother]

appeared to be nil," suggesting there had, earlier, been physical confrontations between the two of them. Again, though, the risk appeared to be "nil" at the time the case was closed, and the older brother is not the subject of these proceedings. (Boldface omitted.)

Section 300, subdivision (a) also applies where there is a substantial risk the child will suffer serious physical harm in the future. (*In re J.K.*, *supra*, 174 Cal.App.4th at pp. 1439-1440.) But the record here lacks substantial evidence that Isabella faced a substantial risk of further serious harm. The primary motivating factor in declaring jurisdiction appears to have been to offer mother services. We have no doubt that providing services to assist a family that has acknowledged the need for support certainly was meant to promote the best interests of Isabella and her entire family, but these good intentions are an insufficient basis upon which to find jurisdiction under section 300, subdivision (a).

> *D. Insufficient Evidence Supports the Allegation that Isabella Faced a Substantial Risk of Harm Under Section 300, Subdivision (b).*

There is even less support in the record for finding jurisdiction under section 300, subdivision (b), which authorizes jurisdiction if a child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure or inability of the parent to adequately supervise or protect the child. "The statutory definition consists of three elements: (1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) The statute "means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness." (*Id.* at p. 823, original italics.)

Jurisdiction under section 300, subdivision (b) in this case was based solely on allegations regarding Isabella's absentee father. The petition alleged that father had mental-health issues and was a self-admitted "Bipolar mental health patient with Schizophrenia and paranoia." And it alleged that Isabella was at substantial risk in his

12

care because "on or about October 12, 2010, the father was escalated and agitated with self inflicted injuries stating he was 'hearing voices' and tired and scared because he couldn't get the voices to stop and did not want to live anymore. As a result of this incident the father was assessed to be a danger to himself and was placed on an involuntary psychiatric hold pursuant to WIC Section 5150." These allegations, however, are insufficient to provide a basis for jurisdiction under section 300, subdivision (b). The events described occurred *more than two years* before the filing of dependency proceedings. There is no evidence in the record that Isabella was in father's care at the time of these events or was affected by them or that she even knew about them. Isabella reported that it had been a long time since she had seen father, and the record contains no indication that father is or will be involved in her life. The Department's investigation was unable to locate father.

In sustaining the section 300, subdivision (b) allegation, the juvenile court did not suggest that father currently posed a risk to Isabella. Instead, the court stated that "while Dad is not in the home now, with the finding of the [subdivision] (b) count, it then becomes clear that if he comes back, he is a threat to her. He is a threat to her mental health. If the Court didn't find that, then Dad could come back, and there's no legal problem with him being there. So this way, Mom is going to be able to say, 'You know, she's comfortable and safe here. But if you come back and live with us, I might lose her.' " The court concluded this approach would "provide the most protection for the minor. So the basis there is on the grounds *not that it's likely to reoccur*, but that it has occurred. And this is, I think, again, a protection for Mom and Daughter against that mental-health issue." (Italics added.)

The purpose of the dependency system is to protect children who are currently being abused, neglected, or exploited, or who are at risk of that harm. (§ 300.2.) If father returns to Isabella's life and there is evidence that he poses a risk to Isabella's well-being, the Department may of course file dependency proceedings in order to protect her best interests. But where father was not alleged to have caused Isabella any harm and there

13

was no evidence presented that he was likely to do so in the future, sustaining the petition's allegation under section 300, subdivision (b) was reversible error.

*E.  The Dispositional Order Also Is Reversed.*

Because we conclude that the jurisdictional findings must be reversed, the dispositional order also must be reversed.  (*In re James R.*, *supra*, 176 Cal.App.4th at p. 137.)

## III.
### DISPOSITION

The juvenile court's May 20, 2013 jurisdictional/dispositional order is reversed.


_____
Humes, J.


We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.

Certified for publication 5/13/14

# CALIFORNIA COURT OF APPEAL
## FIRST APPELLATE DISTRICT
## DIVISION FOUR

IN RE ISABELLA F., a Person Coming Under the Juvenile Court Law.
Sonoma County Human Services Department
v.
Y.M.

A139220
Sonoma County
Sup. Ct. No. 4130DEP

BY THE COURT:

Appellant's request (filed on May 1, 2014) that this court's April 17, 2014 opinion be certified for publication is granted.

The Reporter of Decisions is directed to publish said opinion in the Official Reports.


Date:_____May 13 2014_____    _____Ruvolo_____P. J.


1

| | |
|---|---|
| Trial Court: | Sonoma County Superior Court |
| Trial Judge: | Hon. Anthony Wheeldin |
| Counsel for Appellant: | Roni Keller, under appointment by the First District Appellate Project |
| Counsel for Respondent: | Bruce D. Goldstein, County Counsel, Ian W. Trueblood, Deputy County Counsel; Julia K. Freis |

*Sonoma County Human Services Department v. Y.M.* (A139220)