Filed 8/28/15  In re Ethan G. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re ETHAN G. et al., Persons Coming Under the Juvenile Court Law. | B261318 (Los Angeles County Super. Ct. No. DK06637) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> VALERIE G., <br><br> Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Anthony A. Trendacosta, Judge.  Reversed.

———

Linda Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

———

Mother Valerie G. appeals on substantial evidence grounds from the juvenile court's order sustaining a petition under Welfare and Institutions Code section 300, subdivision (b),[1] concerning her sons Sebastien and Ethan (the children). Dependency jurisdiction over the children was based on the finding that Mother was unable to protect the children from their half-brother, Eric. We agree with Mother that the court's jurisdictional finding is not supported by substantial evidence, and therefore reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2014, Sebastien and Ethan were 12 and 13 years old, respectively. They lived with Mother, their 16 year-old half-brother (Eric), and an adult half-sister (Ariana). The children's father lived about 65 miles away in Riverside County.

According to Mother, Eric has been diagnosed with autistic spectrum disorder and bipolar disorder, and is emotionally disturbed. A social worker stated that Eric "suffers from a mental illness." In 2011 Eric reportedly "attacked" Mother and her boyfriend and threw a water bottle at Ariana. In 2013, he assaulted Mother by slamming her against a wall, pulling her hands behind her back, and pulling her hair. Ethan reported that Eric has hit Sebastien and pushed him to the floor. In 2011 Eric was detained under section 5150 for 42 days and, in early 2014, for two days.[2]

On March 17, 2014, Eric and Mother got into an argument. Eric broke some plates in the kitchen, threw a pair of tweezers at Mother's face, and used his hand to hit Mother in her eye, causing a bruise. Mother called the police. Eric explained to an officer that he was not responsible for his actions, and that "'God did it.'" Eric said that if Mother upset him again, he would not be able to control his emotions and would likely hit her again. The police took Eric to the hospital to be held under section 5150 for the third time.

---

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     Under section 5150, a person may, upon probable cause, be taken into custody for 72 hours for treatment and evaluation if the person, as a result of mental disorder, is a danger to others, or to himself or herself.

2

When the hospital called Mother the next day to pick up Eric, Mother refused, saying she could no longer care for him. Hospital staff then informed DCFS that Mother had abandoned Eric.

A social worker interviewed Mother, the children, and Ariana. Mother described the altercation between her and Eric. The children and Ariana said they did not see the fight. Ethan told the social worker that Eric had threatened him and used to hit him when he was younger. Now, however, Ethan is stronger and taller than Eric and "not afraid" of him.[3] Ethan said he generally avoided Eric because Eric "is unstable and jealous" because the children get to see their father. No one reported any other problems in the home, such as domestic violence, substance abuse, physical or sexual abuse, or insufficient clothing or food.

After Eric returned home from the hospital, he refused to take his medication. Instead, as Mother put it, he was "self-medicating" with marijuana. He also drank and allowed "transient young men" to live in the garage. The men drank her alcohol and ate her food. She admitted she had "'no control'" over the situation.

On June 30, 2014, a social worker met with Mother and the children at their home. When Eric was asked about his medication, he became angry "and stated, 'I don't like medication. If I see it anywhere, in this house, in court, in heaven, I am going to throw it all out, throw it all out.'" The social worker reported that Eric then "turned his verbal aggression toward his sister and brothers," who did not "reply to his rudeness." The social worker "observed the fear owned by every member of this household so much so that they simply allow[ed] Eric to dominate the atmosphere and . . . [did] nothing to correct his inappropriate behaviors." It was "clear" to the social worker that Eric "suffers from a mental illness and . . . is not going to take his medication[,] which seems to be very much needed at the time."

---

[3] Mother testified at the jurisdiction hearing that Ethan, then 14 years old, was 5 feet 11 inches tall and weighed 200 pounds; Eric was 5 feet 9 inches tall and 145 pounds.

Mother later told the social worker that "she and her other children fear for their lives and that [Eric] hit her last [six] months ago and that [he] sometimes taunts his brothers, but that she works very hard to try and keep the 'peace' in the home. She asked the social worker "for immediate help" and "mental health services" for Eric.

On July 2, 2014, DCFS conducted a "Team Decision Meeting" concerning the family. Mother, Sebastien, Ethan, and Ariana were present. Eric refused to attend and, when called by telephone, shouted obscenities at Mother. The participants discussed the possibility of Eric living elsewhere. According to Mother, Eric's father (Juan) "will have nothing to do with Eric," and other relatives have refused to let Eric live with them "due to his unchecked mental health . . . and his behavioral issues." She noted that Eric once assaulted his paternal grandfather shortly after the grandfather had surgery for a heart condition. The social workers indicated that placing Eric in foster care would create "a safety risk . . . to other foster children and foster care providers."

As a result of the Team Decision Meeting, a plan was created that involved: (1) a consultation between Mother and a psychologist about services for Eric; (2) the possibility of having the children spend time with their father; and (3) having Mother call the police whenever Eric threatened Mother or the children.

Six days after the Team Decision Meeting, Mother told a social worker that Eric had calmed down after being told that DCFS would take the children away. She added, however, "that there is no way of ensuring that Eric [will] not become unstable again."

On July 11, 2014, a social worker spoke with the children's father. The father explained that although he wanted the boys to live with him, he had not wanted to go to court to get custody. He said he was unaware of the problems the children were having with Eric.

On July 28, 2014, Eric told Sebastien to give water to their dogs. When Sebastien did not comply, Eric shoved or hit Sebastien, causing Sebastien to hit his head against a wall. When Eric threatened to hit Sebastien again, Ethan told Eric to calm down. Eric then shoved Ethan, and the two began to fight. At some point, Eric tried to choke Ethan.

Mother was in the backyard when the fight began. When she "heard the racket," she went inside the house, saw Eric and Ethan "wrestling," and told the boys to stop. The fighting or wrestling continued for at least a couple minutes after Mother arrived. At some point, Mother called the police. When the fight ended, Eric told Ethan he was "lucky" that Mother was there. Eric left the house before the police arrived. Sebastien and Ethan suffered minor injuries during the fight.

When Mother was asked why she did not do more to stop the fight, she explained that she "was not going to jump into the middle of [the] fight because she could get hurt," and she was "watching the fight to ensure it did not get worse." The police then determined that Mother failed to protect the children and took them into protective custody. DCFS placed them with their father.

Eric was apprehended a day or two after the altercation. Throughout the proceedings relevant to this appeal, Eric was at juvenile hall in the probation department's custody.

On July 31, 2014, DCFS filed a petition under section 300 alleging the following under section 300 subdivision (b): Eric "exhibits symptoms of mental and emotional illness and a substance abuse. As a result, . . . Eric has assaulted [the children] and [Mother] on more than . . . one occasion. [Mother] is unable to protect the children. Such inability to protect the children places the children at risk of harm."[4]

At a detention hearing, the court detained the children from Mother and released them to their father. Mother was granted unmonitored visits.

---

[4]     Additional allegations were made under section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling). They were not, however, sustained by the court.

Prior to the jurisdiction hearing, the social worker interviewed the children. Ethan disagreed with the allegation that Mother failed to protect them, saying that Mother "tried to get help." He explained that Mother "has been trying to get rid of [Eric]. . . . The second time [Eric] hit her she called Children's Services because he has been causing too [many] problems in the home. Children's Services instructed [Mother] to call the cops." Sebastien also disagreed with the allegation, saying that Mother "tried to stop him but he hits her too." Mother denied the allegation.

When Eric was asked about the allegation, he told the social worker: "No, my mom told us to stop," and "my mom is a good mom."

The children's father agreed with the allegation. He further stated that when Mother was at work and Ethan went to football practice, Sebastien would lock himself in his room for up to four hours a day, four days a week.

In its jurisdiction/disposition report, DCFS concluded: "[Mother] failed to protect the children when [she] knew that [Eric] had unresolved mental and emotional problems. [Mother] allowed [Eric] to reside in the children's home and have unlimited access to the children. Such a detrimental and endangering situation established for the children by [Mother] and [Mother's] failure to protect the children endangers the children's physical health and safety and creates a detrimental home environment, placing the children at risk of physical harm, damage, danger and failure to protect."[5]

On August 9, 2014, about two weeks after placement with the children's father, a social worker met with the children. Ethan told the social worker: "I think it's time we live with our dad. It would be fun to live with our dad. It's what I wanted my whole life." Sebastien expressed conflicting desires, stating: "I want to stay here because I need a man to teach me. I want to stay with my mom because I love her." The social

---

[5]  DCFS used stronger language in another part of the jurisdiction/disposition report, stating: "For years, [M]other has allowed Eric to terrorize the family. Mother, as well as the children . . . have been living in fear for the last year and a half due to [Eric]. . . . While [M]other was at work and there was no adult supervision to mediate the situation, mother left the children . . . in a volatile situation."

worker reported that the children were thriving in their father's home. The social worker also met with Eric, who said, "I just want to get out of here [juvenile hall] and go live with my dad."

The jurisdiction hearing was originally set for August 22, 2014. After several continuances, it was held in December 2014. In the meantime, DCFS filed a supplemental report to the court indicating that the children had informed the social worker that they wanted to stay with their father and they feel safe in his care.

In October, DCFS reported a conversation that took place between a social worker and Juan (Eric's father). Juan told the social worker that he and Mother had agreed that when Eric is released from juvenile hall he "would return to his home."[6] Around the same time, Eric's probation officer informed a social worker that "Eric is really emotionally unstable and has created hell in juvenile hall," and had been involved in "violent unusual incidents." The probation officer said that Eric's placement was "up to the Juvenile Court" and that he could be released to a level 12 group home, where he could "walk out at anytime he chose to."

Mother testified at the jurisdiction hearing. She stated that although Eric would bully the children by talking rudely and loudly or "calling them stupid," there were only two instances when he had "gotten really physical" with them. One occasion was the July 28, 2014, incident that led to the children's removal; the other was a fight between Eric and Ethan in 2010.

When asked whether Eric still posed a risk to the children, she said she believed "he has no intention to hurt anybody, either myself or them," but that "he still needs to be watched professionally." She added that Eric told her she was "not allowed in his life anymore" and "plans to never speak to [her] again."

---

**6**     Although the reference to "his home" is ambiguous, other comments in the social worker's report indicate that the phrase referred to Eric's father's home.

Mother testified that she and Juan had agreed that Eric would live with Juan after he is released from juvenile hall. She said if Eric showed up at her house, she would take him to Juan's home; if Eric refused to go, she would take the children to their father's home. She was also willing to get a restraining order against Eric.

Mother was asked about the report that Sebastien would lock himself in his room for four hours, four days a week. She said Sebastien did that because Eric steals from the children, and because Sebastien likes to play video games without being bothered.

In announcing its decision, the court stated that Mother did "everything within reason she could possibly" have done to protect the children. The court further found that "[t]oday there is no risk" to the children because "Eric is incarcerated or at least in the custody of the probation department." Nevertheless, such custody "does not necessarily mean he is going to be placed in a locked facility. . . . And it's not a leap to figure out he'll be returning to the family home." He did not think it was likely Eric would return to his father's home. Therefore, "unless I know that [Eric] is going to be in some sort of locked facility or camp for a while—and I don't know that—I think he poses a risk to his siblings."

The court declared the children dependents of the court and placed them with their father. Mother was granted unmonitored visits. The court ordered mother to attend parenting classes and individual counseling.

Mother appealed.

## DISCUSSION

Under section 300, subdivision (b), the juvenile court may adjudge a child a dependent of the court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . ." "A jurisdictional finding under section 300, subdivision (b)[,] requires: '"(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious

8

physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." [Citation.]' [Citations.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135.)[7]

The third element "effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future." (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.) Evidence of past events that caused harm to the children may be probative as to the risk of harm in the future, but only "if circumstances existing *at the time of the hearing* make it likely the children will suffer the same type of 'serious physical harm or illness' . . . . This is so because under subdivision (b) a child may be considered dependent 'only so long as is necessary' to protect the child from risk of suffering serious physical harm or illness. For this reason, 'the past infliction of physical harm . . . , standing alone, does not establish a substantial risk of physical harm, "[t]here must be some reason to believe the acts may continue in the future."'" (*In re Janet T.* (2001) 93 Cal.App.4th 377, 388 (footnotes omitted).)

In a dependency proceeding, the agency has the burden to prove by a preponderance of the evidence that the minor comes under the jurisdiction of the juvenile court. (§ 355; *In re Isabella F.* (2014) 226 Cal.App.4th 128, 137.) We review the juvenile court's jurisdictional finding for substantial evidence. (*In re James R.*, *supra*, 176 Cal.App.4th at pp. 134-135.)

---

[7]    Although section 300, subdivision (b)(1), refers to a parent's "failure or inability" to adequately supervise or protect a child, this court and division held in *In re Precious D.* (2010) 189 Cal.App.4th 1251, that constitutional due process requires a showing of parental unfitness or neglectful conduct. (*Id.* at pp. 1254, 1261.) In *In re R.T.* (2015) 235 Cal.App.4th 795, review granted. June 17, 2015, another division of this court disagreed with *Precious D.* on this point. The Supreme Court has granted review of *In re R.T.* to address the issue whether section 300, subdivision (b)(1) authorizes dependency jurisdiction without a finding that parental fault or neglect is responsible for the failure or inability to supervise or protect the child.

Mother and DCFS devote a substantial portion of their briefs to the question whether we should follow *Precious D.* Because we base our conclusion on the absence of substantial evidence to support the third element of section 300, subdivision (b), we do not rely upon *Precious D.* or address the issue being considered by the Supreme Court.

Here, there is insufficient evidence to support the court's finding of a substantial risk of harm. The only source of potential harm is Eric. As the court noted, at the time of the jurisdiction hearing, Eric was in juvenile hall and in the custody of the probation department. There was no date for his release and no determination had been made as to the type of facility he would be placed. Even if the court was validly concerned that Eric would be released to an unlocked facility and would then leave that facility, there is no reason to believe that Eric would return to Mother's home. Mother and Juan agreed that Eric would live with Juan after Eric's release. This plan is apparently agreeable to Eric, who informed the social worker that he wanted to get out of juvenile home and "go live with [his] dad" and informed Mother that she was "not allowed in his life anymore." If Eric nevertheless showed up at Mother's house, Mother testified that she would either take him to Juan's home or take the children to their father's home. DCFS's concern that the parents' agreement "would not work" or that the delinquency court "could simply return Eric to [M]other's custody" is speculative and cannot support the court's finding. (See *In re M.W.* (July 6, 2015, B258054) __ Cal.App.4th ___ [2015 Cal.App. Lexis 659] [more than mere speculation is required to demonstrate that the child is at risk of harm]; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565 ["there must be some reason beyond mere speculation to believe" that past acts of harm will reoccur].)

Because there is no substantial evidence to support the court's conclusion that there was a substantial risk or harm to the children in Mother's home, the court's jurisdictional finding cannot stand.

## DISPOSITION

The judgment is reversed.

<u>NOT TO BE PUBLISHED</u>.


                                            ROTHSCHILD, P. J.

We concur:



        CHANEY, J.



        MOOR, J. *

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.