Filed 5/21/26  In re Melody G. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re Melody G., a Person Coming Under the Juvenile Court Law. | B345630 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>E.G.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 25CCJP00246 |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Reversed.

Jordan L. Brown and Pamela R. Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Deputy County Counsel, for Plaintiff and Respondent.

Father E.G. appeals from juvenile court orders sustaining dependency jurisdiction over his minor daughter, Melody, and removing her from his custody and denying placement. We reverse the juvenile court's jurisdictional order as to father for lack of substantial evidence, reverse the subsequent removal and placement orders, and remand.

## BACKGROUND

Before this dependency proceeding commenced, mother J.D., her four-year-old daughter Melody, and her one-year-old son, I.D., resided together with Melody's maternal grandmother, G.B. Father did not reside with mother and the children. I.D. is not father's biological child and is not subject to father's appeal.

In January 2025, the Department of Children and Family Services (DCFS) received a referral alleging mother had physically abused Melody and I.D. Specifically, the maternal grandmother, G.B., reported mother, while intoxicated, hit Melody on the head, kicked I.D.'s rolling chair across the room, and "slam[med]" I.D. into his crib, leaving a " 'giant ball size' lump" on his head. G.B. told DCFS mother's behavior was not new. Previously, mother pushed Melody and knocked her over while upset, causing "severe bruising" to Melody's ear and head when she struck a doorknob. Mother then kept Melody out of school for multiple days after the incident "out of fear Melody would say something and the bruising would be seen by school staff." On other occasions, G.B. had witnessed mother shake or pinch I.D. multiple times because he was crying.

After the DCFS referral, a doctor examined both minors, finding "multiple injuries" on I.D. "consistent with inflicted trauma (child physical abuse)." While the doctor found no injuries on Melody, he opined I.D.'s injuries, combined with the

2

referral's allegations and Melody's statement during the examination that mother "hits and scratches" both children, suggested Melody had been "expos[ed] to violence and historical child physical abuse with identifiable injury . . . consistent with child endangerment." The doctor concluded returning Melody to mother would place Melody "at increased risk of further injury and even death." DCFS secured a pre-dependency-petition order of removal from mother.

At this time, a children's social worker visited Melody's paternal grandparents to begin assessing their home for placement. During the assessment, father, who had so far been unreachable, appeared and introduced himself as Melody's father. When informed of the allegations against mother, father said he avoided all contact with mother because she was "crazy, on drugs[,] and always want[ed] to fight." Father further said he would only see Melody while she spent weekends at the home of paternal grandmother G.R. because he did not have a permanent residence, instead sleeping " 'here and there,' " sometimes at G.R.'s home but other times at the homes of his friends. Father provided no specific address where he could reliably be found. When the social worker asked father about substance use, he admitted "I'm going to be honest, I have used meth in the past." Father elaborated he had been "using for about two years now" with his most recent use occurring "about a week ago." When asked whether he had tried to enroll in a treatment program, father said no, explaining he was "not an addict," could "quit at any time," and was "able to control" his methamphetamine use. Father agreed to drug testing and the social worker provided testing information.

When the social worker asked father about Melody's placement, father asserted he wanted Melody to stay with his mother, G.R., because he was "not stable" enough at the time to care for Melody and Melody was "not safe under the care of mother." Father provided the social worker with a phone number and the interview concluded.

The next day, the social worker arranged a drug test for father. Father later texted the social worker stating he had gone to the testing site but his name had not been entered into the system, so he did not complete a drug test. The day after that, the social worker called father at his provided phone number in an "attempt to ask if he was able to test again" and left a voicemail requesting a return call. It does not appear that father returned the call.

On January 27, 2025, DCFS filed a juvenile dependency petition under Welfare and Institutions Code section 300 alleging father's substance abuse and mother's physical abuse and failure to protect. (Further undesignated statutory references are to the Welfare and Institutions Code.) The following day at a detention hearing, the juvenile court found father to be Melody's presumed father and found sufficient reason to detain Melody from both parents' custody. It ordered that paternal grandmother G.R.'s home be assessed for visitation and placement and ordered separate, monitored visitation for parents.

In late February 2025, after multiple failed attempts to reach father at the phone number he had provided, DCFS successfully contacted father and requested he take an on-demand drug test. Father at first consented but then said no, because he would be unable to reach the testing site before it

4

closed that evening. Two weeks later, on March 12, 2025, father failed to appear for a scheduled drug test.

From further interviews with paternal grandmother G.R., DCFS learned that father, mother, and Melody had lived together in G.R.'s home shortly after Melody's birth. Mother acted "aggressive[ly]" toward father and his family during that time, damaging the walls of the house and, on one occasion, "hit[ting] father with a bat in the face, causing severe injury to his eyes." Mother and father would leave the house and return "under the influence," though G.R. "denied ever coming across any drugs . . . or paraphernalia in the home." After mother and Melody moved out of G.R.'s home, Melody would regularly stay with G.R. on weekends. G.R. had observed injuries on Melody's body multiple times, including "scars on her hand from the mother's fingernails," "scratches on Melody's arms and thigh area," and, on one occasion, "a knot and cut on Melody's head."

A search of a criminal background database revealed a "hit" for a charge in 2018, approximately a year and a half before Melody's birth, of inflicting corporal spousal injury and "disorderly conduct intox/drug." The record provides no further information about this offense, including the substance allegedly involved or any disposition.

When DCFS interviewed mother about father's possible methamphetamine use, she stated she did not know whether he ever used drugs while they were in a relationship or afterwards but declared that father "looked like he was on drugs when [she] saw him [at the juvenile court]," not because he acted in a particular way, but because he was no longer "fat" like he had been when they were together.

DCFS reported father had agreed to and maintained a thrice-weekly visitation schedule with Melody. He had been "consistent" in attending scheduled visits, and those visits were "going well and without incident." Four-year-old Melody could convey only minimal information about father. But while Melody described mother's physical abuse, albeit in simplified terms, Melody "described [father] as nice and shared that he was at work."

At the combined jurisdiction and disposition hearing on April 17, 2025, the court sustained multiple counts against mother and sustained the following single count against father, pursuant to section 300, subdivision (b)(1)(D): "[Father] has a history of substance abuse, and is a current user of methamphetamine, which renders the father incapable of providing regular care for the children. The children are of such a young age, requiring constant care and supervision, and the father's substance abuse interferes with providing regular care and supervision of the children. The father's substance abuse endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of serious physical harm and damage." In doing so, the court implicitly rejected father's argument that there was an insufficient "nexus" between any drug use and serious harm to Melody.

The court both ordered Melody removed from father's physical custody pursuant to section 361, subdivision (d), and denied placement with father pursuant to section 361.2, subdivision (a). The court further ordered that father enroll in a substance abuse program, parenting classes, and counseling, and ordered that father's visits with Melody remain monitored.

Father timely appealed the court's jurisdictional and dispositional orders.

## DISCUSSION

We start with the question of jurisdiction.

Father challenges the juvenile court's jurisdictional finding as unsupported by substantial evidence. We review those " ' "findings for sufficiency of the evidence. [Citations.] We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible. [Citation.] 'However, substantial evidence is not synonymous with any evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal. [Citation.] Furthermore, "[w]hile substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations]." [Citation.] "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." ' " ' " (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046.)

The juvenile court has jurisdiction where, as relevant here, a "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] [t]he inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse." (§ 300, subd. (b)(1)(D).) "[U]nder section 300(b)(1)(D), 'substance abuse' bears its ordinary meaning of excessive use of drugs or alcohol." (*In re N.R.* (2023) 15 Cal.5th 520, 555.) And the statute "requires more

7

than just the identification of substance abuse. . . . A court must also find that the parent . . . is unable to provide regular care for a child and that as a result, the child has suffered serious physical harm or illness or is at significant risk of suffering serious physical harm or illness." (*Id.* at p. 556.)

Father's own statements show that he used methamphetamine over the course of two years prior to dependency proceedings, including as recently as "about a week" before being interviewed. While father provided no further information about the nature and frequency of his drug use, and while he insisted he was not an addict and had full control over his usage, we will assume the juvenile court could have reasonably inferred father's use of methamphetamine rose to the level of substance abuse. Father's multiple missed or avoided drug tests would provide support for such a finding. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1212, disapproved of on another ground in *In re N.R., supra*, 15 Cal.5th at p. 560, fn. 18.) "[A] missed drug test, without adequate justification, is 'properly considered the equivalent of a positive test result.' " (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384, disapproved of on another ground in *In re N.R., supra*, 15 Cal.5th at p. 560, fn. 18.) Courts may likewise reasonably infer from a refusal to submit to drug testing that a parent's substance use is more frequent than admitted. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 186.)

Yet even if the record supports a finding that father abused methamphetamine, that, as noted, is insufficient for jurisdiction. As our Supreme Court recently explained, "it is inappropriate to regard a parent's or guardian's excessive use of alcohol or an addictive drug as always being sufficient, by itself, to show that

8

the parent or guardian is unable to provide regular care for a young child and that the child is therefore at substantial risk of serious physical harm." (*In re N.R., supra,* 15 Cal.5th at pp. 558−559.) Otherwise, key elements of section 300, subdivision (b)(1)(D), go unexplored. A court may not "shortcut" the inquiry demanded of it by regarding substance abuse as "prima facie evidence" of an inability to provide care, then "look[ing] to the parent or guardian to rebut this presumption." (*In re N.R.,* at pp. 559−560.)

Examining the record, we conclude insufficient evidence supports a finding of serious physical harm, or risk thereof, to Melody due to father's substance abuse. Father has been a noncustodial parent for most of Melody's life, living apart from Melody's primary home. Father's interactions with Melody generally occurred when he visited paternal grandmother G.R.'s house on weekends. There is no evidence of any incident between father and Melody during these interactions suggesting harm or risk of harm to Melody. More important, the DCFS reported father's thrice-weekly monitored visits with Melody during the time leading up to the jurisdiction hearing were unequivocally positive, stating the visits were "consistent," "going well," and proceeding "without incident." There was no sign substance abuse compromised these visits.

There is, indeed, no evidence father used or abused methamphetamine in Melody's presence. Nor is there evidence father engaged in substance-related behavior that risked harm to Melody. In fact, the DCFS reports do not address any aspect of father's asserted substance-related behavior or the risks thereof. Courts have accorded leeway to parents whose substance use has seriously risked harm to their children in a single instance,

9

accepting the wisdom of second chances, yet there is no indication here that father's admitted use has risked Melody's safety even once.  (See, e.g., *In re Gilberto G.* (2024) 105 Cal.App.5th 52, 67 [a single instance of mother being intoxicated in public with her children in her care was not sufficient to find her conduct created a substantial risk of serious harm to the children]; *In re J.N.* (2010) 181 Cal.App.4th 1010, 1026 [parents' intoxication while caring for their children and the subsequent substance-related vehicle collision with the children in the vehicle were insufficient, without additional incidents, to establish the children were at substantial risk of harm].)

We find similarities to this case in *In re B.D.* (2024) 103 Cal.App.5th 315.  There, a mother and her newborn both tested positive for opiates, and the mother had also tested positive for marijuana and hydrocodone earlier in the pregnancy.  (*In re B.D.*, *supra*, 103 Cal.App.5th at p. 318.)  Mother refused further drug tests until finally agreeing to a test three months after giving birth, which was positive for hydrocodone and hydromorphone.  (*Id.* at p. 320.)  Thereafter, mother refused all further testing.  (*Ibid.*)  The appellate court reversed the juvenile court's jurisdictional findings that mother's substance abuse had caused serious physical harm — or presented a substantial risk of serious physical harm — to her newborn or her older child.  (*Id.* at p. 332.)  While the court acknowledged three positive drug tests and multiple refused tests could reasonably cause a court to infer substance abuse, that court insisted such a finding "did not end the jurisdictional analysis." (*Id.* at p. 325.)  " 'Even with sufficient proof of substance abuse, the government also bears the burden of proving by a preponderance of the evidence [citation] that this abuse makes the parent . . . unable to provide regular

care for a child, and that this inability has caused a child to suffer serious physical harm or illness or places the child at substantial risk of serious physical harm or illness.' " (*Ibid.*)

The court in *In re B.D.* found, despite the mother's repeated positive drug tests before, during, and after childbirth, as well as her newborn child's positive drug test, there was no evidence her drug use had harmed either of her children. (*In re B.D.*, *supra*, 103 Cal.App.5th at p. 325.) The newborn "did not suffer any apparent adverse physical symptoms of prenatal drug exposure," "did not experience symptoms of drug withdrawal," and was not "premature, underweight, or unhealthy in any way." (*Id.* at 326.) Social workers "found no concerns with the state of [mother's] home or mother's care of the children" and there was "no evidence that mother was impaired when caring for the children" or "that mother had a prior child welfare history related to substance abuse or inadequate care of the children." (*Id.* at pp. 330–331.) The court concluded substantial evidence of harm to a child "requires more than speculation or conjecture." (*Id.* at p. 329.)

Like *In re B.D.,* father admitted to substance use and missed or refused multiple drug tests, allowing for a court to draw reasonable inferences about his possible substance abuse. Yet there is no evidence on the record tying father's substance use to past, present, or likely future harm to Melody. *In re B.D.* is distinguishable in that the mother there was a successful custodial parent with a longer track record of care while father here had success in monitored visits. But section 300, subsection (b)(1)(D), is tailored to substance abuse that presages serious harm and it does not address other parental shortcomings, which the statute addresses in other subdivisions. Father's successful visits, meanwhile, suggest the absence of risk, not its presence.

11

There may have been other grounds, and may be other grounds, for juvenile court jurisdiction with respect to father, but to proceed under section 300(b)(1)(D), which is the basis for jurisdiction DCFS asserts before us, DCFS needed to "present evidence of a specific, nonspeculative and substantial risk . . . of serious physical harm" to Melody due to father's substance abuse. (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003.)  It has not.

DCFS contends father's failure to protect Melody from mother despite knowing of mother's mental instability is evidence that father's substance abuse has caused Melody harm. However, the authority to which DCFS cites to sustain this argument, *In re Travis C.* (2017) 13 Cal.App.5th 1219, instead further illustrates the link section 300, subdivision (b)(1)(D), requires between a parent's condition and the risk to the child. There, a mother's mental "illness and her failure to consistently treat it [had] already put [her children] into situations where they were at a substantial risk of serious physical harm." (*In re Travis C.,* at p. 1226.)  There was evidence mother chose to not treat her mental illness and mother's psychiatrist reported he would be concerned for the children's safety without mother being treated. (*Ibid.*)  Mother had already threatened suicide in front of the children and there was other evidence of "severe episodes related to her illness" with the children present. (*Ibid.*)  Here, there is no evidence — only speculation — that father's asserted failure to remove Melody from harm's way was related to his substance use.

Accordingly, we conclude substantial evidence does not support the juvenile court's jurisdictional finding as to father and reverse it.  This does not mean that father's substance use is irrelevant to the dependency matter.  Nor does this "mean the

12

DCFS cannot try again" to obtain jurisdiction based on father's conduct, but only that "DCFS failed to prove the grounds it asserted or to assert the grounds it might have proved." (*In re Janet T.* (2001) 93 Cal.App.4th 377, 392; *In re Isabella F.* (2014) 226 Cal.App.4th 128, 140–141 [if an absentee father who previously suffered mental illness "returns to [the child's] life and there is evidence that he poses a risk . . . , [DCFS] may of course file dependency proceedings"].) We note jurisdiction over Melody remains proper given the jurisdictional findings related to mother's conduct. (*In re X.S.* (2010) 190 Cal.App.4th 1154, 1161.)

Though the juvenile court did not base its removal and placement orders as to father exclusively on father's substance use, these orders were entwined with the erroneous jurisdictional finding and we reverse them as well, as to him alone, so the juvenile court can reconsider them in light of current circumstances. (See *In re X.S.*, *supra*, 190 Cal.App.4th at pp. 1161–1162; see also *In re Isabella F.*, *supra*, 226 Cal.App.4th at p. 141.) We express no opinion as to how the juvenile court should rule on remand.

## DISPOSITION

We reverse the juvenile court's jurisdictional findings as to father under section 300, subdivision (b)(1)(D).  We likewise reverse the entwined removal and placement orders as to father.  With respect to those dispositional orders, we remand for the juvenile court to reconsider them in light of current circumstances.


SCHERB. J.

We concur:


STRATTON, P.J.


WILEY, J.

14