Filed 12/21/21  In re Hayley P. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re HAYLEY P. et al., Persons Coming Under the Juvenile Court Law. | B310953 (Los Angeles County  Super. Ct. Nos. 20CCJP06805A, 20CCJP06805B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. A.F. et al., Defendants and Appellants. | |

APPEAL from orders of the Superior Court for Los Angeles County, Michael Abzug, Judge.  Affirmed.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant A.F.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant T.P.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Senior Deputy County Counsel, for Plaintiff and Respondent.

A.F. (mother) and T.P. (father) appeal from the juvenile court's jurisdiction orders regarding their daughters Hayley P. and Madison P., on the ground there was insufficient evidence to support the court's findings that their daughters were persons described by Welfare and Institutions Code[1] section 300, subdivisions (a), (b), and (j). We conclude that substantial evidence supports the juvenile court's findings, and affirm the orders as to both children.

## BACKGROUND

A.  *The Referral and Initial Investigation*

On December 23, 2020, the Los Angeles County Department of Children and Family Services (the Department) received a referral regarding Hayley, who was 16 years old. The reporting party stated that Hayley had been transported by sheriff's deputies to the emergency room at Harbor UCLA Medical Center on a 5585 hold for being a danger to others. The reporting party stated that Hayley was interviewed by the emergency room pediatrician, Dr. Warren. Hayley told Dr. Warren that the previous day she was involved in a verbal argument with mother over a cell phone, and that the argument turned

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

2

into a physical fight. She said that mother hit her with her hands several times. Hayley said she was afraid of mother and ran away that night, but she returned the next morning. When she returned, the fight continued. She said that mother kicked her in the stomach, and then father joined in, punching her with a closed fist. Hayley said she fought back by hitting father and biting mother to get away from them. Hayley also told Dr. Warren that the physical abuse by her parents was ongoing on a monthly basis; she said, however, that Madison, her eight-year-old sister, was not hit or hurt by their parents.

Dr. Warren examined Hayley, and wrote in her chart that she had multiple bruises on her body that were consistent with her story of being physically assaulted by mother and father. Hayley also was assessed by a psychiatrist, who removed the 5585 hold and cleared her to be discharged. Hayley denied being afraid of returning home, but said that "she would like for 'things' to change in the home with her parents."

Later that day, a social worker from the Department interviewed Hayley in the emergency room, and asked her how she got there. Hayley told her that she had run away from home at around 10:00 p.m. the previous night after she and mother "got into it" because Hayley had been "hanging out" with her friends. Hayley said that mother "whooped" her with a belt, so Hayley left and stayed at her boyfriend's house. When she went back home at 7:00 a.m. the next morning, father got out of his car as soon as she stepped on the grass and pushed her into the grass. Hayley was able to get into the house, where father pushed her into the couch and on the floor, and hit her on the head.

She said that she "put [her] hands on him" because he kept putting his finger in her face, and then he left the house. Hayley went to get her phone, which mother had taken from her. She grabbed the phone and ran to the bathroom. She said that mother went after her, breaking down the door. Mother pulled her hair, hit her in her head, and dragged her while trying to take Hayley's phone away; Hayley fought back. Hayley then left, and father followed her in his car, telling her to get in the car. Hayley went to the security gate instead and called the police. Hayley said that when the police arrived they questioned her and had her transported by ambulance to the hospital. Hayley told the social worker that a week and a half before this incident she had been in the hospital on a 72-hour hold. She said it was because she and mother got into another argument, and mother said she was out of control.[2]

When asked to describe her parents, Hayley said mother "can be very cool but when she feels she's being disrespected she will try to resolve that by discipline." She said that father was an alcoholic and "really mean." She said her parents disciplined her by taking her phone or hitting or beating her with a belt; she said that mother hit her with a belt during the incident the previous day. She also told the social worker that her sister Madison was not physically disciplined, and that her parents only take Madison's phone away when they discipline her. Hayley said her only worry about going home was that she would "just

---

[2]     Hayley contracted COVID-19 during that earlier hospital stay. She tested positive for the disease when she was admitted for the current stay; she said she did not feel sick, but her body ached.

4

get beat again," although she thought her parents would not do that now that the Department is involved. When asked why she had not told anyone about the beatings before, Hayley said her parents told her that "this was how [she] should be disciplined because [she had] a smart mouth." She indicated that father did not usually hit her, but that mother did, and said it had been going on for a year or two.

After leaving the hospital, the social worker spoke with a sheriff's deputy, who provided her with information from the report filed by the deputies who had responded to Hayley's 911 call. According to the deputy, the report stated that Hayley had some behavioral issues, such as sneaking out of the home at night and sneaking her boyfriend into the home. The report also stated that Hayley bit her mother during an altercation because she wanted her phone back. In addition, the report stated that the responding deputy spoke with Madison, who said she did not witness Hayley being assaulted by her parents, but only saw Hayley being held down. Madison also told the deputy that she had never seen her parents hit Hayley before.

The social worker then spoke with mother and father. Mother denied Hayley's account of what happened. She told the social worker that Hayley wanted her phone back and when mother told her no, "we got into it." Hayley tried to take the phone, but when she could not get it she left the house, at around 9:00 or 10:00 p.m. on December 22. She came back at around 8:00 a.m. the next morning and "went on one." Mother and father tried to talk to her, but "she acted like she couldn't listen." Mother said that father never hit Hayley, although "he threw her off of him" and then left the house. Mother said that she was on the

5

phone with her mother (the maternal grandmother, or MGM), and Hayley was yelling at her, screaming, "Give me my fucking phone." When mother said no, Hayley attacked her. Mother told the social worker that Hayley "was banging me in my head nonstop and I had to defend myself." She said that Hayley bit her, and showed the social worker the bite mark on her arm. When the social worker asked how Hayley got all of the bruises on her body, mother said that she did not know.

Mother told the social worker that Hayley was constantly sneaking out of the house. She said that Hayley gets upset because she cannot go out (due to COVID-19) and cannot see her boyfriend. Mother said that they discipline Hayley by taking away her phone, but then they usually feel bad and give it back to her. Mother insisted that Hayley attacked her and father first, because mother would not give Hayley her phone back. Mother said, "Hayley doesn't want to listen to me or my husband and she wants to do what she wants."

With regard to Hayley's earlier hospital stay, mother explained that she took Hayley to the emergency room after Hayley's boyfriend had broken up with her because Hayley was saying that she wanted to kill herself. The hospital admitted Hayley, and she was there for a week. Mother reported that Hayley was meeting with a therapist for three hours, two days a week, and was on medication (although Hayley was not taking one of her prescribed drugs because it made her sleepy).

The social worker then spoke with father. He also denied Hayley's account of the incident. He said that Hayley attacked mother and then fell to the ground. He told the social worker he did not know what

happened after that because he left.  He said he then went looking for Hayley in his car, found her, and told her to get into the car, but Hayley took off on her bike.

When the social worker asked mother and father what they were willing to do to make sure this did not happen again, mother said she would do whatever needed to be done, and suggested that family counseling services would be helpful.  Father said that he could not tolerate the disrespect from Hayley.  He told the social worker that Hayley had everything she wanted or asked for, and all they asked from her was respect.

The next day, the social worker spoke with Madison.  Madison told the social worker that mother "doesn't like disrespect and if you hit her and be rude to her she doesn't play.  She pops me on my arm and tells me to stop.  She slaps my sister because she's rude and disrespectful."  She said that father "doesn't play with people but he's nice to me and he tries to be nice to my sister."  However, Madison said father "whoops" her when she does not listen, although she said that only happened once, and she did not remember the last time it happened.

When asked about the incident with Hayley, Madison said that the night before the incident, Hayley came back to home to eat after being with friends down the street.  Hayley said she wanted to go back out after eating, but mother said she had to stay home.  Hayley and mother started arguing.  Hayley tried to take mother's phone, and they continued arguing until mother told Hayley to leave.  Hayley left, and father and mother went to find her.  Madison was asleep when Hayley

came back home the next morning, so she did not see her parents hit Hayley. But she said that when she saw Hayley, Hayley was crying because father "popped her because she kicked [father's] butt." Madison said that Hayley kept being disrespectful to mother, "[t]hen my dad had to come to her and pop her and I was sitting in the chair watching." She said that mother was on the phone talking to MGM, and Hayley yelled at her, "Give me my fucking phone." Hayley somehow got the phone and went into the bathroom and locked the door. Mother pushed the door open, and Madison said she thought mother "popped" Hayley, but she did not know; she said she heard "popping" but did not know "who was being popped." Then Madison saw Hayley hitting mother in the head multiple times, fighting over the phone. Hayley was on the floor, stretched out and trying to reach the phone while mother held her foot. Madison got involved by grabbing the phone, and Hayley got up and ran out the door.

After speaking with Madison, the social worker went back to the hospital to pick up Hayley (the Department had concluded that Hayley, who was being discharged from the hospital, needed to be detained with exigency). While there, the social worker spoke with Dr. Robert Hataley. Dr. Hataley reported that the child abuse team was consulted regarding Hayley, and they all agreed that Hayley's bruises were consistent with child abuse. Dr. Hataley said that he agreed with the child abuse team's conclusion.

Hayley eventually was detained with the maternal grandparents. When the social worker went to the grandparents' home to complete the placement paperwork, she asked MGM if she heard Hayley yelling

during MGM's phone call with mother. MGM said she did. She said that mother had asked Hayley to give her five minutes because she was talking to her parents, but Hayley was "in a rage." MGM said that Hayley "was cursing at her mother. Its ongoing when she doesn't get her way." MGM told the social worker that she had never seen mother or father discipline their children physically, and that it is not in either parent's character to hit their children.

The social worker also spoke to Hayley's maternal aunt, who said she did not believe that mother or father physically abused Hayley. The maternal aunt also said that she was very close to Hayley, and Hayley never told her about any physical abuse.

B.    *The Petition and Detention Hearing*

The Department filed a petition as to both Hayley and Madison under section 300, subdivisions (a), (b), and (j). Counts a-1, b-1, and j-1 alleged that mother physically abused Hayley, and that that physical abuse endangers Hayley and places both Hayley and Madison at risk of serious physical harm. Counts a-2, b-2, and j-2 made the same allegation as to father. Count b-3 alleged that Hayley suffers from mental, emotional, and behavioral problems, including suicidal ideation, and has a diagnosis of depression, anxiety, and OCD, and that mother and father are limited in their ability to provide her with appropriate parental care and supervision, which places her at risk of serious physical harm.

At the detention hearing, the Department recommended that both children be detained from mother and father, with Madison being

9

released home-of-parent with a safety plan. Minor's counsel agreed with the Department's recommendation as to Madison, and agreed that Hayley should be detained, but argued that Hayley could be released to her parents with wraparound services in place; however, counsel recommended that Hayley should continue to reside with the maternal grandparents to give Hayley and her parents a cooling off period. The juvenile court found that a prima facie case existed that Hayley and Madison were persons described by section 300. It ordered that Hayley be removed from mother and father and placed with the maternal grandparents, and that Madison be released to mother and father with services.

C.    *The Jurisdiction/Disposition Report and Hearing*

In the jurisdiction/disposition report filed by the Department, the Department reported on a prior referral in 2015, in which the caller said that Hayley told her that father hit her with an extension cord. During the Department's investigation of that referral, father told the investigating social worker that he had threatened to hit Hayley with an extension cord when she misbehaved, but did so only in an attempt to scare her and stop her bad behavior. He admitted to hitting Hayley in the past with a belt; he said he hit her on her buttocks and upper leg area, with her clothes on, and no marks or bruises were ever left. Hayley denied any current physical abuse at that time and stated that father only threatened her, and he had never hit her with an extension cord. The Department concluded that the allegations of physical abuse

10

toward Hayley were inconclusive; it conducted a risk assessment and determined the risk to be low.

The jurisdiction/disposition report also included summaries of interviews of Hayley, Madison, mother, and father conducted by the dependency investigator. The report also included a summary of the dependency investigator's interview of Detective David W. Van Dyke, who was conducting a criminal investigation of the incident for the Los Angeles Sheriff Department's Special Victims Bureau, as well as a summary of Detective Van Dyke's incident report.

### 1. *Interview with Hayley*

Hayley told the investigator that she lied when she was at the hospital because she was upset. After the dependency investigator told her that the Department would not go away just because she changed her story, Haley told the investigator that she just wanted to go home. She said that she had assaulted mother and father because she could not get her way. She said that she bit mother and kicked father in the butt. When asked if she struck father and knocked off his glasses, Hayley quietly admitted that she had. She said that Madison threw shoes at her to try to get her off of mother.

Hayley talked about her relationship with each of her parents, and told the investigator that her parents were good providers and did not deserve what she was putting them through. She said that she would change, and again told the investigator that she just wanted to go back home, and that she assaulted her parents because she was trying to get her way. When asked about the stories she told the doctors and

11

responding officers, Hayley said, "I called the police. I played a huge role in this mess. I feel bad because my mother might lose her job. I could have listened and walked away."

The investigator asked her about the bruises and injuries she sustained, and Hayley said they came from falling off her sister's bike when she snuck out of the house. At the end of the interview, Hayley had a list of questions for the investigator. Hayley was adamant that she did not tell the truth right after the incident and that she wanted to go home.

2. *Interview with Madison*

Madison told the investigator that she wanted Hayley to come home, but not if she was going to be "acting all crazy." Describing the incident, Madison said that Hayley ran away from home and her parents went to places they thought she might be; she said they drove around at one in the morning looking for her. When asked whether she witnessed the altercation, Madison said that Hayley tried to fight father and kicked him in the butt. She told the investigator, unprompted, that father was trying to defend himself. When asked what happened between Hayley and mother, Madison said that mother tried to get the phone from Hayley and they ended up on the floor. She also said that Hayley bit mother on the arm.

3. *Interview with Mother*

Mother told the investigator, "Hayley assaulted us. No one hit her. It was something about that phone. She wanted to get to the

cellphone and whatever was on it." Mother said that when she told Hayley she could not have her phone back, Hayley started screaming. Mother said Hayley was enraged and attacked her. They struggled over the phone and ended up on the floor, and at some point Hayley bit her. Mother was adamant that Hayley attacked her.

Mother told the investigator that Hayley was calling her every day from maternal grandparents' home and telling her that she lied and did not think it would go this far; she told mother repeatedly that she wanted to come home. Hayley also told her that the detective investigating the incident was filing charges against mother; mother said she was worried because she could lose her job if charges were filed against her. Mother said that Hayley fabricated the story because she was upset that mother would not return her phone to her.

Mother said that she wanted Hayley returned to her, but she also noted she was concerned that Hayley would revert back to the same behaviors without intervention by the Department. She explained that she had been having problems with Hayley ever since Hayley's acne cleared up and she became confident in her appearance and got a boyfriend.

4.    *Interview with Father*

Father adamantly denied physically abusing or assaulting Hayley, and told the investigator that Hayley assaulted them. He insisted that nothing happened on the grass, and that Hayley lied to everyone. Father told the investigator that Hayley had recanted and admitted that she assaulted them.

13

5.      *Interview with Detective Van Dyke*

Detective Van Dyke told the dependency investigator that the case was going to be submitted for review, and that the District Attorney could accept or reject the case for filing. He said that his major concerns were that father had a previous history of using a belt on the child, and that everyone's stories were changing. He also said that he could not ignore the fact that Hayley had injuries and/or bruises, even though she changed her story about how she got them.

In his incident report, Detective Van Dyke indicated that Hayley told him that during a verbal argument she had with her parents, father kept antagonizing her for sneaking out the night before and coming home early in the morning. Hayley said that father punched her in the face area, pushed her into a wall, and strangled her. Hayley went to mother and asked for her cell phone, which mother had taken away from her for sneaking out of the house. Hayley grabbed the phone and went into the bathroom. She said that mother pushed the bathroom door open and grabbed the phone back. Hayley said she yelled at mother to give her back her phone, and mother started to hit her. She said they fell to the ground, and mother hit her in the face area and pulled her hair. She also told Detective Van Dyke that Madison hit her with shoes. Hayley said she assaulted her parents because they were hitting her. However, she said that she did not want to get her parents in trouble and wanted to go home.

Detective Van Dyke reported that he went to the hospital to see Hayley and observed a one-inch abrasion on the left side of her neck,

redness to both cheeks, and a quarter-inch abrasion on the top of her right foot; he did not observe injuries indicative of strangulation.

Detective Van Dyke reported that he then contacted father and mother. Father told him that he got into a verbal argument with Hayley about how she was being disrespectful by sneaking out of the house to see her boyfriend. He told the detective that he never physically assaulted Hayley, but that he tried to defend himself when she started hitting him. He tried to grab her arms to keep her from hitting him, and he pushed her back to get distance between them. He said he left the house to de-escalate the situation, but mother called him and asked him to return home because Hayley had assaulted her.

Mother told Detective Van Dyke that father and Hayley were having a verbal argument about Hayley sneaking out at night and coming home early in the morning. Hayley hit father in the head, knocking off his eyeglasses. Hayley continued to try to hit father, and father was trying to grab her arms to defend himself. Hayley stopped, and father left the house. Hayley then started yelling at mother, demanding her phone. Hayley approached mother, who was seated at the kitchen table, and grabbed the phone. Mother followed Hayley as she walked toward the bathroom. When Hayley tried to close the bathroom door, mother pushed it open and grabbed the phone back from Hayley. Hayley began to hit mother on the arms and chest area, and mother tried to grab Hayley's arms to stop her from hitting her. When asked if she ever pulled Hayley's hair, mother responded that she could not recall, but she might have done so when she was trying to get

15

control of Hayley. Mother told the detective that Hayley bit her on the arm; he observed a two-inch bite mark on mother's forearm.

### 6. *Jurisdiction/Disposition Hearing*

The jurisdiction/disposition hearing was held on February 17, 2021. At the start of the hearing, counsel for the Department requested a 30-day continuance, explaining that there was outstanding discovery for law enforcement call logs and updates regarding the criminal case. Minor's counsel objected to the continuance, noting that the Department had sufficient evidence to proceed with the adjudication, and arguing that the juvenile court should not wait for the criminal case to proceed because the criminal case moves more slowly than the dependency case should. The juvenile court agreed with minor's counsel, stating: "You know, the criminal tail doesn't wag the dependency dog, and the standard that we—that I am guided by is a far different standard than what is going on in the criminal case." Therefore, the court denied the Department's request and proceeded with the jurisdiction hearing.

The Department offered and the court admitted into evidence the various reports that had been filed in the case; no other evidence was offered. Counsel for the Department argued that the court should find that Hayley's initial statements of abuse were more credible that her subsequent recantation. Counsel noted that Hayley was consistent in her initial accounts to the medical professionals, the social worker, and law enforcement, and she only changed her account after expressing her strong desire to go home. Mother's counsel argued there was a lack of

16

evidence to support counts a-1, b-1, j-1, a-2, b-2, and j-2, because Hayley admitted she was the aggressor and mother was just trying to defend herself. Mother submitted, however, on count b-3. Father's counsel requested that father be dismissed from the petition, arguing there was no evidence that father physically abused Hayley, since Hayley admitted that she lied and that she was the one who assaulted him. With regard to count b-3, father's counsel argued that father always maintained that he was willing and able to get Hayley all the help she needed. Minor's counsel submitted on counts a-1, b-1, j-1, a-2, b-2, and j-2, although counsel said she did not necessarily agree that there was a current risk under counts a-1 and a-2. However, counsel argued that there was no current risk under count b-3.

In making its ruling, the juvenile court stated that "these domestic violence issues are very difficult to resolve as to who is responsible. That's especially true in a case where . . . there's objective evidence that the child suffered injuries which are inconsistent with the parents' statutory privilege to administer corporal punishment, but there's also evidence that at least the mother was injured. [¶] She had a bite mark or something on her left arm, so—but I also note this is not the first time the family has come to the attention of law enforcement with allegations of child abuse, and on balance, it seems to me that the Department has reached a rather low threshold. It's not invisible, but it's low to sustain the counts." Addressing the requirement that there be a current risk to the children, the court observed that "the fact that the parents are in therapy, the child is receiving services and everyone is willing to cooperate with [the Department] while worth noting, does

17

not equate to a finding of no current risk especially when the incident in this case, which was pretty violent, occurred relatively recently within the last couple of months."

The court found by a preponderance of the evidence that all of the counts in the petition were true as alleged, and found both children to be persons described by section 300, subdivisions (a), (b), and (j). Moving to disposition, the court heard arguments from counsel, then declared both children to be dependents of the juvenile court. It ordered Hayley removed from mother and father with family reunification services to Hayley and both parents, and ordered Madison released to her parents with family maintenance services to Madison and her parents.

Mother and father timely filed notices of appeal from the jurisdiction orders. Two months later, on April 23, 2021, the juvenile court terminated jurisdiction as to Hayley because she had passed away. The record on appeal does not indicate the date or cause of Hayley's passing.

## DISCUSSION

Both mother and father challenge the juvenile court's jurisdiction order, arguing there was insufficient evidence to support the findings of physical abuse by either parent. We disagree.

"In reviewing the sufficiency of the evidence on appeal we consider the entire record to determine whether substantial evidence supports the court's findings. [Citation.] We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the

18

evidence. Rather, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if other evidence supports a contrary finding. [Citations.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 134–135.) "The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order." (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 138.)

As relevant here, a child may be adjudged to be a dependent of the juvenile court if: (1) "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent" (§ 300, subd. (a)); (2) "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child" (§ 300, subd. (b)); or (3) "[t]he child's sibling has been abused or neglected, as defined in subdivision (a) [or] (b) . . . and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions" (§ 300, subd. (j)). Mother and father argue that the evidence presented in this case does not show that Hayley suffered any serious injury, or that she was at risk of suffering serious physical harm, and therefore the juvenile court erred in finding that Hayley and Madison were persons described under section 300, subdivision (a), (b), or (j). Under the standard of review applicable here, we conclude otherwise.

To find that a child comes within subdivision (a) of section 300, it is not necessary to show that the child has already suffered a serious

19

injury inflicted nonaccidentally. That subdivision provides that "a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (§ 300, subd. (a).) In other words, "[t]he court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.)

In the present case, there was evidence that Hayley suffered bruising and/or abrasions on her neck, cheeks, foot, arms, thighs, and knees that the hospital's child abuse team found to be consistent with child abuse. According to Hayley's initial interviews with hospital staff, law enforcement, and the social worker, these injuries were inflicted during an exceptionally violent episode in which father pushed and hit Hayley, and mother hit Haley and pulled her hair, with the fight escalating so much that mother and Hayley ended up on the floor of the bathroom. Madison, who witnessed part of the episode (and joined in the fight at one point by throwing shoes at Hayley), confirmed that both father and mother "popped" Hayley. Even though Hayley, and to some extent Madison, recanted their initial accounts of what happened, the juvenile court was entitled to credit their initial accounts, just as it was entitled to conclude that mother and father were not credible when describing the incident as one in which Hayley was the aggressor and they merely tried to defend themselves. (*In re James R.*, *supra*, 176

Cal.App.4th at p. 135 ["We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence"].)

In addition to the extremely violent nature of the recent incident, there also was evidence of previous physical abuse. Father admitted that he had hit Hayley with a belt in the past. Haley said that both father and mother hit or slapped her, or beat her with a belt for discipline. And Madison said that mother "pops" her and slaps Hayley when they are disrespectful or rude. Madison also said that father had "whoop[ed]" her for discipline in the past.

From this evidence of the injuries Hayley suffered, the violent nature of the recent incident, and the evidence of previous inappropriate physical discipline, the juvenile court reasonably could conclude that both Hayley and Madison were at substantial risk of suffering serious physical harm inflicted nonaccidentally (§ 300, subd. (a)) or as a result of mother and father's failure to protect them (§ 300, subd. (b)), and that Madison was at substantial risk of being abused (§ 300, subd. (j)). Accordingly, we affirm the juvenile court's jurisdictional findings and orders.

//

//

//

//

//

//

//

## DISPOSITION

The jurisdictional findings and orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.

We concur:


COLLINS, J.


CURREY, J.