Filed 9/19/22  In re Jennifer C. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re JENNIFER C., a Person Coming Under the Juvenile Court Law. | B317775 |
| | (Los Angeles County Super. Ct. No. 21CCJP04258A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JAMES C., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Linda L. Sun, Judge.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Senior Deputy County Counsel, for Plaintiff and Respondent.

———————————

After sustaining a petition pursuant to Welfare and Institutions Code section 300, subdivisions (a) (serious physical harm) and (b)(1) (failure to protect),[1] based on James C.'s physical abuse of his 17-year-old daughter, Jennifer C., the juvenile court found that Jennifer was safely in the custody of her mother, Veronica C., and it was in the interest of justice and the welfare of the child to terminate jurisdiction subject to entry of a juvenile court custody order awarding Veronica sole physical custody and Veronica and James joint legal custody. The court ordered only monitored contact between James and Jennifer until James completed four individual counseling sessions. Two months later Jennifer had her 18th birthday.

We agree with the Los Angeles County Department of Children and Family Services that James's appeal of the jurisdiction findings is moot because the dependency proceedings were terminated, the custody order ceased to be in effect when Jennifer turned 18, and any potential adverse consequences from the court's findings are far too speculative to justify discretionary appellate review of an otherwise moot case. (See *In re Rashad D.* (2021) 63 Cal.App.5th 156, 164, fn. 5; *In re David B.* (2017) 12 Cal.App.5th 633, 654; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1493; but see *In re Emily L.* (2021) 73 Cal.App.5th 1, 15

_____

[1]     Statutory references are to this code.

2

[although appeal of jurisdiction findings is moot when child is no longer subject to juvenile court jurisdiction, discretionary review is warranted if the alleged conduct reasonably places the parent at risk of inclusion in the Child Abuse Central Index (CACI)].)

Nonetheless, because the Supreme Court will soon decide whether termination of dependency jurisdiction moots an appeal from a jurisdiction finding when a parent asserts the finding is stigmatizing or may bar a challenge to future placement on the CACI (see *In re D.P.,* review granted May 26, 2021, S267429), and in an abundance of caution (see *In re C.C.* (2009) 172 Cal.App.4th 1481, 1489), we review the merits of James's appeal.  We affirm the juvenile court's findings and order.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The August 6, 2021 Incident and Prior Instances of Alleged Physical Abuse*

The Department filed a non-detain petition on August 9, 2021 alleging, in part, that James had physically abused Jennifer during a confrontation in which he restrained her and which prompted the paternal grandmother to intervene by pulling James off Jennifer.  According to the referral, described in the Department's report accompanying the dependency petition, on August 6, 2021 Jennifer brought soup from her mother's apartment to the home where Jennifer lived with James; her 14-year-old brother, Robert;[2] and the paternal grandmother, Virginia C.  James told Jennifer not to take the food into her

---

[2]     James and Veronica had been living apart since April 2017.  According to Veronica, she and James agreed to share custody and let the children decide how often they wanted to see each parent.

3

room. Jennifer ignored him, and James followed Jennifer into her room. Jennifer told the individual who reported the incident that she was afraid of James and threw water on him to get him to leave. James became angry, pinned Jennifer to the ground and started to choke her. The paternal grandmother came into the room, which allowed Jennifer to escape. Jennifer thereafter made a plan to live with Veronica.

Jennifer confirmed the initial reporting, telling the social worker James ordered her not to take the soup into her room, but she ignored him, went inside her room and closed the door. When James pushed the door open, Jennifer got upset and threw a cup of water at him. James responded by grabbing her. As she resisted, she fell to the floor. James was restraining her on the floor with his hands on her neck when Virginia come into the room and pulled James off.

Virginia explained to the social worker that, after Jennifer took the soup into her room, she told James, as he started to follow Jennifer, to leave it alone. James persisted; and Virginia then heard banging and screaming from Jennifer's room. Virginia entered the room and pulled James off Jennifer.

Veronica, interviewed several days later, told the social worker that Jennifer was now living with her. Jennifer had arrived at Veronica's apartment immediately after the incident. Explaining what happened, Jennifer told Veronica she had pulled James toward her to try to get past him, but she fell, and he choked her. Veronica stated Jennifer was upset and crying as she recounted the confrontation.

At the initial hearing on September 15, 2021 the juvenile court found the Department's petition established a prima facie

4

case for jurisdiction.[3]  Jennifer was allowed to remain in the custody of both parents.  The court ordered individual counseling for her and conjoint counseling for Jennifer and James with a neutral therapist.

Interviewed on September 28, 2021 for the Department's jurisdiction/disposition report, Jennifer expanded on her description of the incident, explaining that, as she walked toward her room with the soup after ignoring James's order, he began walking after her, moving faster, which scared her and made her feel threatened.  She moved quickly to her room and tried to close the door as James was pushing it open.  She had a cup of water in her hand, which she threw at James so he would back off.  That made him angrier: "[H]e pushed the door open, and he put his hands on my shoulders and pushed me onto boxes I had in my room.  I was on the boxes, and he was holding me down by the shoulders, then my grandma came in the hallway, and he put his hand (right hand) on my neck and was holding me down, while my grandma was trying to get him off me.  He eventually got off me. . . .  He wasn't choking me, but was holding me down.  I couldn't breathe, but it wasn't because of his hand on my neck; it was because he was forcing me on the box.  His knee was on the right side of my body. . . .  It left really bad scratches and bruises on my back, and it didn't go away for a month."

---

[3]     The original petition included an allegation that James's physical abuse of Jennifer also put Robert at risk of serious physical harm; Veronica knew of James's physical abuse of Jennifer and failed to protect her and Robert; and James and Veronica had a history of domestic violence.  The allegations involving Robert and Veronica and the charge of domestic violence were ultimately dismissed.

Jennifer also described to the social worker several other incidents when James had been physically abusive, including one occasion when he grabbed her by the back of the neck, forcing her to look at an air mattress[4] and leaving scratch marks; a second time when he grabbed her by the arms while she was trying to go out with a friend, squeezing his nails into her and again leaving marks; and a third event when James got angry and threw various items at her, including a coffee tray, because she wanted to go out with her water polo teammates following an out-of-town tournament and James wanted her to stay in the hotel room with him to watch a baseball game. According to Jennifer, James told her it was her fault he had to put his hands on her because she was out of control.

For his part, James stated he had never abused Jennifer, physically or emotionally, although he admitted he was sometimes hard on her. He acknowledged restraining Jennifer on August 6, 2021, holding her arms, but said he did so for protective reasons. He denied being on top of her or having his hand on her neck and said Virginia had not pulled him off Jennifer. Insisting that Jennifer twisted everything in her favor, James's recollection of the various other incidents reported by Jennifer involved her yelling at him and James responding by trying to calm her down.

---

[4] Jennifer explained she told James she had trypophobia and the pattern of holes on the air mattress "creeps me out," which angered James.

2. *The Jurisdiction Hearing and Order Terminating Jurisdiction*

In its jurisdiction/disposition report the Department stated Jennifer appeared to be "safe in the home" because she was living with her mother and did not want to return to James's home, and, likewise, James did not want her to return to his home. Nonetheless, a more informal resolution of the situation (that is, without adjudicating Jennifer a dependent child of the court) through a section 301 contract or a section 360, subdivision (b), determination was not feasible because James was not willing to sign the case plan. Accordingly, the Department recommended the court declare Jennifer a dependent child, allow her to remain released to her parents and order family maintenance services that for James would include a parenting class focused on communication and appropriate discipline and individual counseling to address anger management.

In a last minute information report for the court, filed November 8, 2021, the Department modified its recommendation, suggesting the court assume jurisdiction but then immediately terminate it with a juvenile court custody order granting full physical custody of Jennifer to Veronica and joint legal custody to Veronica and James, with the requirement that James participate in individual counseling and James and Jennifer participate in conjoint counseling. The Department also recommended visitation for James occur in a therapeutic setting until Jennifer turned 18 years old.

At the hearing on November 10, 2021 Jennifer's counsel argued the court should sustain the allegations of physical abuse; and James's counsel urged the court to dismiss the petition, contending there was no evidence Jennifer was at risk of serious

physical injury. Noting that Jennifer was two months away from turning 18, counsel continued, "There's nothing we're going to be able to do to solve the relationship between the father and this child in that two-month period."

The court sustained the section 300, subdivisions (a) and (b)(1), allegations, as amended by interlineation to eliminate the reference to choking, finding James had physically abused Jennifer by restraining her during the August 2021 incident, requiring the paternal grandmother to intervene to pull James off Jennifer. The sustained allegations also included findings that on prior occasions the father shook the child and grabbed her by the neck and held her while forcing her to watch a video. These actions, the court found, placed Jennifer at risk of serious physical harm.

Explaining its findings, the court stated, "There are a few prior incidents between Jennifer and the father, which may not have been found conclusive or substantiated by the Department. However, . . . I think it shows a pattern that the father has been having a difficult communication with—or relationship with Jennifer. . . . The father resorted to physical violence when dealing with Jennifer even though Jennifer may not be a 100 percent obedient or she is just behaving like a teenager, but the father [resorted] to physical matters to restrain Jennifer or to show his displeasure of Jennifer's behavior. The older incidents are relevant in that it shows that the father's conduct has escalated over time." Referring to information from Jennifer's therapist detailed in the Department's reports, which had been admitted into evidence, the court continued, "Her therapist is very concerned for the child's physical and emotional well-being, and the child has expressed suicidal ideation because of the

8

father. And the father continues to blame others for his conduct and not accept responsibility, and that is a concern as well."

Turning to disposition the court essentially adopted the recommendation in the Department's last minute information report, terminating jurisdiction without declaring Jennifer a dependent of the court, conditioned on entry of a juvenile court custody order awarding sole physical custody of Jennifer to Veronica with joint legal custody in both parents. For the two months remaining before Jennifer turned 18 years old, James was limited to monitored visitation until he completed four individual counseling sessions.[5]

James filed a timely notice of appeal.

## DISCUSSION

1. *Governing Law and Standard of Review*

Section 300, subdivision (a), provides that jurisdiction may be assumed if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm inflicted nonaccidentally by the child's parent or guardian. "Nonaccidental" generally means a parent or guardian "acted intentionally or willfully." (*In re R.T.* (2017) 3 Cal.5th 622, 629.)

Section 300, subdivision (b)(1), allows a child to be adjudged a dependent of the juvenile court when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the

---

[5] The custody order as described by the court was filed on December 3, 2021.

9

child from the conduct of a custodian with whom the child has been left." A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness. (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601; *In re L.W.* (2019) 32 Cal.App.5th 840, 848; see *In re R.T.*, *supra*, 3 Cal.5th at p. 624 ["section 300(b)(1) authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child"].)

Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146), the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Cole L.*, *supra*, 70 Cal.App.5th at p. 602; *In re N.M.* (2011) 197 Cal.App.4th 159, 165.) The court may consider past events in deciding whether a child currently needs the court's protection. (*In re Cole L.*, at p. 602; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215-1216; *In re N.M.*, at p. 165.) A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461; accord, *In re J.N.* (2021) 62 Cal.App.5th 767, 775 ["[e]vidence of past conduct may be probative of current conditions and may assist [the Department] in meeting [its burden of proof]"].)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J., supra*, 56 Cal.4th at p. 773.) We review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that a reasonable trier of fact could find that the order is appropriate. (*Ibid.*; accord, *In re I.C.* (2018) 4 Cal.5th 869, 892.)

2. *Substantial Evidence Supported the Finding Jennifer Was at a Substantial Risk of Serious Physical Harm*

In assuming jurisdiction over Jennifer, the juvenile court impliedly credited Jennifer's description of the physical confrontation with her father on August 6, 2021, as well as the other incidents of violence over the years, and disbelieved James's sanitized version of events. Based on that evidence, the court found James's intentional (nonaccidental) conduct constituted physical abuse that created a substantial risk of serious physical harm to Jennifer within the meaning of both subdivisions (a) and (b)(1) of section 300. James's argument on appeal that there was no evidence Jennifer had actually suffered serious physical harm (that is, that the scratches and bruises were not serious injuries) is misplaced: "[A] court may find there

11

is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions." (§ 300, subd. (a); see *In re Isabella F.* (2014) 226 Cal.App.4th 128, 139 ["section 300, subdivision (a) may apply when a minor suffers less serious injuries but there is a history of repeated abuse"].)[6]

Apparently recognizing he cannot successfully attack the court's credibility determinations and its underlying findings that the various violent events occurred as Jennifer reported them to the social worker, James's sole challenge to the ultimate jurisdiction finding—the risk of future serious physical harm—is that, because of a change in the family's situation, by the time of the hearing on November 10, 2021, there was no longer any risk of a further altercation between James and Jennifer. In support of his argument James explained he had not seen Jennifer since the August 2021 incident and he was in favor of Jennifer continuing to live with Veronica. That Jennifer, on her own, decided to live with Veronica, however, did not constitute a change in family dynamics sufficient to alleviate the risk of harm to the child evidenced by James's past physical abuse.

To reiterate, the juvenile court found that James had engaged in escalating acts of physical abuse in response to

_____

[6]     Equally misplaced is James's argument that the Department did not allege he caused Jennifer to suffer serious emotional damage within the meaning of section 300, subdivision (c), and, therefore, the juvenile court could not assume jurisdiction on that basis. Although the court expressed concern about Jennifer's emotional well-being and the impact of James's poor parenting skills on her mental health, it did not purport to exercise dependency jurisdiction on that basis.

12

Jennifer's teenage defiance to parental authority. His attacks left scratches and bruises that lasted for weeks. The incident precipitating the filing of the dependency petition required the intervention of the paternal grandmother, who pulled James off Jennifer as he was restraining her. The juvenile court reasonably concluded that, left unchecked, this behavior not only created a direct risk of future physical harm to Jennifer but also, based on the therapist's report, was one of the root causes of Jennifer's suicidal ideation, another risk factor for future physical harm to the child. That risk was aggravated by James's refusal to acknowledge his responsibility for the violence. (See *In re Gabriel K*. (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"]; *In re Esmeralda B*. (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].)

The arrangements for Jennifer's housing after the August 2021 incident were, at most, a modest alteration of the family's living arrangements. Prior to August 2021, whether James and Jennifer lived together was also a voluntary decision. And Jennifer, whose mental health issues were documented in the Department's reports, was apparently willing to reside with James notwithstanding the earlier episodes of abuse—a decision explained in part by the fact that she also argued with her mother. Absent the court's assumption of jurisdiction and entry of the custody order protecting Jennifer, James and Veronica would continue to share custody of Jennifer; and nothing would have prevented James and Jennifer from resuming the dysfunctional, violence-filled relationship that led to filing of the

13

dependency petition.[7]  In addition, contrary to the implication of James's argument on appeal, it appears that Jennifer continued to come to James's home to do laundry and perhaps on occasion to retrieve belongings from her room at that house.

In marked contrast, in *In re Emily L.*, *supra*, 73 Cal.App.5th 1, the case upon which James primarily relies, by the time of the jurisdiction hearing, "familial circumstances had undergone epic changes." (*Id.* at p. 15.)  The physical altercation between Emily and her mother that led to dependency proceedings in that case, which Emily prompted and during which the mother called the 911 emergency number asking for police assistance, had occurred in October 2019. (*Id.* at p. 5.)  As of the jurisdiction hearing held 14 months later in December 2020—at which the mother, father and Emily all asked that the dependency petition be dismissed—Emily had made a "remarkable transformation." (*Id.* at p. 16.)  "[T]here was no evidence Emily was still quick to anger, prone to violence, smoking marijuana, ditching school, staying out overnight without permission, or disrespecting her parents and their rules. . . .  Emily's sea change may have occurred because of her brother's tragic death, the absence of her 'bad' best friend, the little therapy she managed to receive, or simply because she had matured.  In any event, no further confrontations had occurred with Mother in over a year, including during the three-month period of her 'extended' stay with Mother from June to September

---

[7]  The record indicates Jennifer was actually spending most nights with her boyfriend, not at Veronica's apartment.  As the Department suggests, that living situation was necessarily tenuous.  If the couple broke up, returning to James's home remained a possibility absent court intervention.

2020. . . . And there was certainly no evidence that a violent altercation like the one Emily precipitated with Mother in October 2019 would occur again." (*Id.* at pp. 15-16, fn. omitted.) Thus, the court of appeal ruled, the evidence relied upon by the juvenile court to support jurisdiction was stale; there was no risk of future harm. (*Id.* at p. 16.)

Unlike the situation in *In re Emily L.*, the evidence here of a continuing risk of harm was anything but stale. James's most recent attack had occurred only three months before the jurisdiction hearing. Although ordered by the court at the initial hearing, James and Jennifer had not participated in any conjoint counseling during that period. (Jennifer refused to attend with James.) There was no evidence that James's and Jennifer's attitude toward each other (or in general) had changed. To the contrary, as discussed, James would not even acknowledge his responsibility for the violent encounters. In sum, viewing the record in the light most favorable to the judgment, as we must, substantial evidence supported the juvenile court's jurisdiction findings.

## DISPOSITION

The November 10, 2021 findings and order are affirmed.


                                    PERLUSS, P. J.

We concur:



    SEGAL, J.              FEUER, J.

15