Filed 6/10/25; Certified for Publication 7/1/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re E.G. et al., Persons Coming Under the Juvenile Court Law. | B338002 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ERICK C., <br><br> Defendant and Appellant. | (Los Angeles County Super. Ct. No. 23CCJP03814A–C) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Pete R. Navarro, Juvenile Court Referee. Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica Buckelew, Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court found siblings E.G., I.G., and K.G. came within its jurisdiction pursuant to Welfare and Institutions Code[1] section 300, subdivisions (b)(1), (d), and (j).  Presumed father Erick C. contends the court's jurisdictional findings were not supported by substantial evidence.  We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  *Referral and Initial Investigation*

The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in September 2023 after E.G., age 11, reported being sexually abused by her stepfather Erick C.  After attending a school assembly concerning safety, boundaries, and inappropriate behavior, E.G. had asked to speak to her school counselor and reported being uncomfortable during the assembly because she had experienced something similar.  E.G. said Erick C. would direct her to take off her clothes and then place his body against hers, both with and without clothing.  E.G. disclosed she had been raped once and that penetration had occurred; the touching and groping happened multiple times.  E.G. appeared nervous and "genuinely upset" while confiding in her counselor.  She did not want to say much about the abuse, because when she had previously confided in her friend Luz about it, Luz told E.G.'s mother Evelyn B. (Mother), and Mother said it was not true.  E.G. seemed worried and did not want the counselor to tell Mother about the abuse.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

E.G. reported to police investigating the allegations that Erick C. touched her inappropriately and placed his penis inside her vagina. The first incident occurred when she was six years old and sleeping in bed with Mother and Erick C. After Mother got up in the night and left for work, Erick C. told E.G. to be quiet and took off her clothes. Erick C. touched E.G.'s breast, inserted his fingers inside her vagina, kissed her, and nibbled on her ear. He turned E.G. onto her side and inserted his semi-erect penis into her vagina. He did not use birth control, and he did not ejaculate. E.G. refused Erick C.'s instruction to get on top of him, at which time he got up and brushed his teeth. He returned to the bed and held E.G. by the wrist until Mother texted she was on her way home.

E.G. told the police the second incident was similar and occurred when she was eight years old. E.G. was sleeping in bed with Mother and Erick C.; Mother left for work, and Erick C. removed E.G.'s clothes and touched her. Erick C. placed her on her side and inserted his semi-erect penis into her vagina.

In the third incident, when E.G. was nine years old, she was sleeping with her siblings when Erick C. attempted to touch her inappropriately. (When describing what Erick C. had done, E.G. motioned to her vaginal area.) E.G. kicked him. Erick C. said he only wanted to hug her, but E.G. responded, "No, you don't, back away."

E.G. told the police that a few months earlier, Erick C. hugged her from behind and touched her chest while they were swimming. Mother noticed and told Erick C. not to touch her. Erick C. released E.G., and Mother grabbed and pulled her away from him.

3

Mother told the police Erick C. was "never around" E.G., so what E.G. had reported was "a shocker." However, Mother also said the sexual abuse had been brought to her attention in March 2023, when she picked up E.G. from the home of E.G.'s friend Luz. Luz asked Mother if she knew Erick C. had raped E.G., and E.G. nudged Luz to shut up and not tell Mother. When Luz's mother asked what was going on, Mother repeated what Luz had said. Mother stated she did not know about it and, if it were true, she would have reported it and left Erick C. On the car ride home, Mother asked E.G. why she had said what she said and asked if E.G. knew what rape was. E.G. said no. Mother told E.G. she should not make such serious allegations, especially if she does not know what they mean, as they could negatively affect an innocent person and get them in trouble. Mother continued to speak to E.G., who then denied the abuse.

Mother told police E.G. made the accusation because Erick C. gave E.G.'s siblings more attention, love, and affection than he gave her. Erick C. denied abusing E.G.

DCFS social worker Jeanette Arzate spoke to E.G. on September 28, 2023. Arzate asked E.G. why she (Arzate) was there, and E.G. said, " 'So you could talk to me about what happened about my father doing sexual abuse to me.' " E.G. said she did not feel comfortable talking with Arzate about what happened and refused to provide a statement. She denied concerns about sexual abuse of her siblings and denied there was anything she wanted to report to DCFS. E.G. said Erick C. looked at her in "a weird way" and said she did not feel safe with him in the home. She said she was willing to stay in the home if Erick C. left, and she asked that he leave for at least two weeks.

4

E.G. told Arzate her best friend Luz told Mother about the abuse, but Mother thought it was a lie. E.G. then denied the abuse to Mother because she felt Mother would not believe her. E.G. reported the family needed money " 'because we struggle and don't have money to pay for food. [Erick C.] gives my mom food and he's the one who mostly pays for everything.' "

E.G. admitted self-harm and suicidal thoughts. She told Arzate she was " 'a little useless right now' " and felt like harming herself. E.G. said she had been feeling suicidal " '[s]ince this happened[,] when I saw the police come[,] because I knew that this was going to happen.' " E.G. said she felt suicidal three or more times per month and engaged in self-harm once or twice per month.

E.G. said she sometimes had homicidal ideation when someone made her angry or sad. The last time she felt that way had been a few months ago when her friend called her a bad name, pulled her hair, and said she looked like a witch. E.G. had not had a plan to kill her friend—she just wanted to get revenge by pushing her or pulling her hair.

E.G. said she had slight difficulty eating and sleeping, both symptoms of depression. E.G. told Arzate she had played with fire in the past and had a history of lying. She admitted outbursts of rage, verbal and/or physical acts of aggression, and hallucinations in which she heard someone say her name and saw a person in the hallway who was not there.

E.G. said Erick C. disciplined her by yelling and grabbing her wrist or slapping her face, leaving redness. E.G. reported Erick C. had slapped her that day because she did not wash her dish. Mother confirmed Erick C. had hit E.G., but said it was because E.G. was about to hit him.

5

When speaking with DCFS, Mother confirmed she had worked at night for three months in 2020.  She acknowledged that in March or April 2023, Luz asked her if Erick C. was raping E.G.  In the car afterwards, Mother asked E.G. if she knew what rape was.  When E.G. said no, Mother " 'told her making accusations like that could get us in trouble, and she can even be taken away from me and the kids.' "  Mother admitted, " 'I did snap on her.  I asked her again why she said that.  She started crying.  I told her: "[E.G.] tell me the truth.  Is it true that he is doing that?"  She said: "No."  I asked her again, and she still said no.  I said: "Why you lying?  Why you saying stuff like that?" and she was just crying.  She wouldn't say anything.  I told her to not be making lies or stuff like that because it could get her or anyone in trouble, and if it was true to actually speak up and to not be afraid because I was not going to do anything bad to her.  I told her that I would take action on that if it was true, but she said no.  That was it.' "

Mother denied the children had been sexually abused.  When asked if she believed E.G., "[M]other stated that she does and she does not, as she is confused.  Mother stated that she is in shock; however, she does believe her daughter despite her confusion.  Mother stated that she will do everything possible to protect her and to ensure that her children are protected.  Mother stated that she would like all exams to be completed in order to determine the truth."

Erick C. told DCFS it had been more than a year since he last had slept in the same bed as the children.  He denied ever striking them.  He denied abusing E.G. and said it would never cross his mind to do so.  He had never disrobed the children or touched them sexually.  When asked why E.G. would make such

6

an accusation, Erick C. described E.G. as strange and said they did not get along. He said she misbehaved and did not listen when punished. Just that day, Erick C. said, " 'I told her to do something, but in her rebellion, she doesn't want to do anything and on the contrary, she wants to control us (parents). I told her that I was going to slap her. I did raise my hand, but I didn't hit her.' " The only time he had actually hit E.G. was about five months earlier; he hit her on the arm, leaving no marks, when she did not listen to him. Erick C. agreed to leave the home for two weeks.

E.G.'s two younger siblings denied sexual abuse.

In October 2023, E.G.'s school counselor told DCFS that when E.G. came back to school after disclosing the sexual abuse, E.G. said the police initially said they were going to take E.G. away, but they told Erick C. to leave instead. E.G. said Mother had looked at her like she was not happy with her and it made E.G. feel terrible; Mother had also made a comment blaming E.G. for what was happening.

During a forensic interview on October 10, 2023, E.G. "stated when she was 6 years old her stepfather took off his clothes and then her clothes. He put his penis in her butthole, flipped her over and put it in her vagina and then repeated both acts again. She stated he grabbed her chest, arms, stomach and back with his hands. [E.G] said he kissed her on the mouth putting his tongue in her mouth. She stated the kissing was rough. She said he put his fingers into her private part and moved them up and down making her body shake a little and then he stopped. [E.G] said he asked her to get on top of him but she said no. [E.G.] said she never said anything because she was scared her parents would get in trouble and that they would not

7

have enough money for rent. She said the same thing happened again when she was 8 years old. [E.G.] said another time she was getting out of the shower and he tried to touch her private part but she covered herself with a towel and he did not touch her. [E.G.] said in the 4th grade she told her friend Lu[z] and then last year her friend Lu[z] told her mother. [E.G.] said she didn't think her mom would believe her so when her mom [a]sked her she said nothing had happened."

The forensic physical examination of E.G. was normal, but that did not mean that no sexual abuse had occurred because the most recent incident was alleged to have taken place three years earlier, and children heal quickly.

In October 2023, the maternal grandmother told DCFS she did not believe E.G. or the sexual abuse allegations, and Erick C. "would never do such a thing." Maternal aunt Gloria M. said Erick C. was a good, calm person who loved children. She said she never thought Erick C. would abuse E.G. and that " 'we are all hoping that it is not true.' " She believed if Erick C. had raped E.G., there would have been screaming and trauma because E.G. was so small.

On October 25, 2023, a DCFS social worker told Mother DCFS was considering opening a voluntary case that would avoid court with a six-month contract between Mother and DCFS. Mother asked if this was a six-month contract for Erick C. to be out of the home and "that would be it." The social worker said E.G. had disclosed that Erick C. had sexually abused her, and he needed to remain out of the home. Mother became upset and asked who would pay her rent and bills. Mother said she was already stressed over finances, but the social worker said she could not let Erick C. back in the home just because she needed

8

financial assistance.  Mother complained the investigation was taking too long and accused DCFS of trying to make money from it.

The following day, Mother spoke with a supervising social worker (SCSW) at DCFS.  "Mother spoke about her need for this case to be 'resolved,' as she needs to be able to work and pay her bills.  The SCSW described for mother that, in general, when there is a credible report of sexual abuse in a family, DCFS will either request that the perpetrator remain out of the home or will request that the child stay with a family member, friend, or, as a last resort, be placed in foster care, in order to protect the child while the family receives services.  However, if the mother is protective and the perpetrator is out of the home, the children can remain in the home.  The SCSW explained that having the children remain in the home is the best option for the children, if possible, and that DCFS is still evaluating whether she is able to be protective.  Mother said that she is being protective because the step-father is currently out of the home but she wanted to know how long that would need to continue.  The SCSW explained that the department will expect mother to be protective of the children, ongoing.  Mother asked what 'ongoing' means. The SCSW stated that she will be expected to be protective of her children until they turn 18.  Mother again began to speak about her bills and wanted to know if DCFS will help her."

Mother asked the SCSW, " 'Well what if all of this isn't true?  What if my daughter is lying?'  The SCSW explained that few children lie about sexual abuse and her daughter has given a very credible statement.  Mother said she does not know the details about what her daughter has said.  She said her daughter has spoken with friends at school and the friends told her that

9

this has happened to them as well, 'so now everyone is saying they're a victim.' " Mother agreed to protect E.G., but she "never expressed any concern for her daughter or any outrage that this could have happened to her daughter. She did not appear to be entertaining the idea that her daughter's allegations even could be true. She repeated her expressions of worry about finances several times during the interview, as well as expressions of doubt about her daughter's credibility."

Mother continued to see and speak with Erick C., although she said she did not discuss the sexual abuse allegations with him. She said she would not allow him to have contact with the children.

On November 6, 2023, DCFS filed a petition alleging all three children came within the jurisdiction of the juvenile court under section 300, subdivisions (b)(1) (failure to protect) and (d) (sexual abuse) due to Erick C.'s sexual abuse of E.G. The younger siblings were also alleged to be subject to juvenile court jurisdiction under section 300, subdivision (j) (abuse of sibling). An allegation concerning substance abuse by Mother was initially made but later dismissed.

At the detention hearing, the court ordered the children released to Mother and ordered Erick C. to stay away from E.G.

II. ***November and December 2024***

E.G. began online therapy in November 2023. The therapist could see Mother in the background during sessions. The therapist was unaware of the sexual abuse allegations and reported both E.G. and Mother denied any type of child abuse or trauma.

10

E.G. recounted the sexual abuse to social worker Alejandra Carranza on December 7, 2023. E.G. said it happened at night when she was six years old. E.G. slept in Mother's room because she had nightmares. E.G. said after Mother left for work, Erick C. " 'would take off his clothes, then he would do the same to me. He would put his private part in my butthole and flip me and put it in my private part.' " Erick C. put his penis halfway inside her. E.G. said she did not know how many times it happened, but it was more than once. She described Erick C. touching her private parts, stomach, arm, back and chest. He nibbled on her ear, put his finger on her vagina, and moved his finger up and down. E.G. said Erick C. tried to put her on top of him but she said no; he stopped after she refused a second time.

E.G. said the last incident happened when she was eight years old. When Carranza asked about Erick C. hugging her from behind and touching her chest in the pool, E.G. said that incident was true.

E.G. reported she had told her friend about the abuse when she was in second grade, and her friend told Mother. She did not tell Mother about the sexual abuse for several years because she was scared. She explained, " 'I would act like nothing happened because I didn't want to get in trouble and separate my family.' " E.G. denied her siblings had been sexually abused.

While speaking with Carranza, E.G. denied depression or suicidal thoughts and claimed she was comfortable with her therapist, whom she had seen three times. E.G. wanted "all this to be over with because she does not want any more problems for her mom." She said, " 'I feel sad that my mom is sad. I don't want her going through a lot, like being on time for appointments.' " While being interviewed, E.G. appeared

11

nervous: her legs were shaking, she continuously bit her nails, and she kept looking toward the bedroom to make sure no one was coming out.

Mother told DCFS she did not want to believe E.G.'s allegations and denied any knowledge of sexual abuse. Mother said Erick C. was never home, although she did admit leaving the children home with him at night approximately two years earlier. Mother said she and Erick C. were both shocked by E.G.'s allegations of abuse in March 2023. Mother told DCFS, " 'I'm not saying I didn't believe her. [E.G] didn't mention it again and I left it at that.' " Mother felt stuck between her daughter and her husband, and she wanted to know the truth. Less than a week later, Mother spoke with the police and "denied everything [E.G.] said because it could not have happened."

DCFS spoke with multiple maternal relatives in December 2023, all of whom praised Erick C. and were, at a minimum, skeptical of E.G.'s allegations. The maternal grandmother denied the children had been abused. She said Erick C. was very dedicated and worked hard to provide for the family. She could not answer when asked about the allegations of sexual abuse. The maternal grandmother said, " 'I will try to support her but I don't know.' " She described E.G. as spoiled, rude to Erick C., and having " 'a really bad attitude.' "

Maternal uncle Cesar E. called Mother and Erick C. perfect parents. He found the sexual abuse allegations upsetting, and he did not believe E.G. He said he did not know why E.G. " 'would say something dumb.' " He said E.G. had lied before, "snitching" on her cousins during play. Cesar E. felt sorry for Mother.

Maternal aunt Gloria M. described the parents as loving and responsible, and the children as very spoiled. Erick C. was

good to the children.  Gloria M. never had concerns about sexual abuse, nor had she seen E.G. act afraid or depressed.  Gloria M. was shocked by the allegations because the children " 'tell us everything.  Everything is saddening and I'm trying to support my sister and [E.G.]' "  When asked if she believed E.G., Gloria M. responded, " 'I'm supporting her and no one treats her different due to this case.' "

Maternal aunt Cindi P. told DCFS she supported the family, but she felt that if there had been abuse Mother would have noticed and E.G. would have said something.  Erick C. was a good father and she had no concerns about abuse or neglect of the children.  She had never seen Erick C. behave inappropriately, there were no red flags, and E.G.'s behavior had not changed.

III.  *Recantation*

On February 15, 2024, E.G. met with Carranza at school.  E.G. appeared nervous and scared.  Hesitating to approach Carranza, she looked back and forth at the staff and Carranza and then "abruptly asked, 'Who are you and who do you work for?' "  Once reminded they had spoken before, E.G. agreed to speak with Carranza.

E.G. told Carranza her maternal aunt Janet[2] had taken her to a room in private and asked if the allegations were true.  Janet told E.G. DCFS would "take her away" if she was lying about the allegations but she would be able to "stay" if she was honest.

---

[2]     No last name is provided for Janet in the record.  From names in the record, it appears Janet may be the same person as Gloria M., but this cannot be conclusively determined from the record on appeal.

13

Janet said that if Erick C. had done what E.G. alleged, she would have felt pain, and she suggested E.G. had dreamed the abuse. E.G. told Carranza, referring to the abuse, " 'I didn't feel it but I saw it so it must have been a dream.' " E.G. said the allegations were not true and it had all been a dream because her parents watched movies that depicted kissing, hugging and touching.

E.G. said Janet was the first person she told she had lied, and then she and Janet spoke about it with Mother. According to E.G., Mother asked if she wanted to be " 'taken away as a punishment' " for making false allegations, and Mother and Janet had spoken with someone to prevent her from being taken away. Mother told her she was disappointed E.G. had lied but happy that she was telling the truth.

When reminded that she had told six different people about the abuse and had provided detailed information, E.G. said, " 'I know but I lied.' " E.G. asked Carranza, " 'Are you going to tell the court? Not because I'm scared but just to know.' " Carranza told her the information would be given to the court. Carranza told E.G. she wanted to make sure E.G. would feel safe and comfortable if Erick C. returned home. E.G. said Erick C. would not be home because he worked a lot, then asked if the social workers would continue to check on them.

E.G. denied anyone at home talked about the case, made her feel bad, or said negative things about her. She said she wanted to visit with Erick C. E.G. reported she did not have privacy during therapy sessions, and she always told the therapist she was happy. Throughout the interview with Carranza, E.G. "appeared to be nervous/jittery as she shook her leg, looked around the room and moved her hands around. [E.G].

14

appeared to be very concerned about the time and how long the interview was taking."

Mother told DCFS that maternal aunt Janet spoke with E.G. because E.G. trusted her, and E.G. admitted lying because she was upset Erick C. had not let her go out with a friend. Mother wanted to know if Erick C. could start visiting E.G. The social worker told her it was too soon for visits and E.G. needed continued therapy. She advised Mother that no one in the family should discuss the allegations with E.G.

E.G.'s therapist reported to DCFS that both E.G. and Mother said the abuse allegations were not true. The therapist told DCFS that during sessions she spoke first to Mother, then to E.G. Mother reported no concerns about E.G.'s behavior and said everything was going well, which struck the therapist as strange because E.G. had been referred for therapy due to "bad and out of control" behavior.

Mother was always nearby while the therapist and E.G. spoke, and when asked a question, E.G. tended to look around the room or ask Mother for permission to answer the question. E.G. seemed to have a " 'nervous twitch and/or fear aspect about her.' " She was very careful in her responses and seemed uncomfortable answering certain questions. The therapist expressed concern whether E.G. was able to be fully honest during sessions because of Mother's constant proximity, and she believed in-person therapy would be a good idea.

Because neither E.G. nor Mother reported any issues, the therapist was planning to discharge E.G. from therapy soon. The therapist wanted to support E.G. but could not force her to share in therapy if she did not want to do so. Despite all the concerns,

15

E.G. and Mother seemed to have a strong relationship and to get along well.

DCFS advised the court E.G. could be recanting due to the conversations at home and expressed concern that Janet might have planted a story in E.G.'s mind that the abuse was merely a dream. DCFS also found it concerning that E.G.'s explanation of why she had lied changed over time: At first, E.G. said she lied because she was upset that day, but when the social worker interviewed her, E.G. did not mention anything about being upset. E.G. now claimed to have lied because she had spoken to her aunt and believed that what occurred was simply a dream. DCFS reported, "It is evident that [E.G.] is feeling pressured by [M]other and maternal aunt since they continue to talk to her about the allegations. Maternal aunt made comments about being honest or else she could be 'taken away.' It should be noted, that [M]other showed [E.G] the court report and questioned [E.G.] about being honest." DCFS also noted E.G.'s story could not be reconciled with her March 2023 confidential disclosure of abuse to Luz.

DCFS believed E.G. recanted because she did not want to cause further problems for her family. She could be feeling scared, guilty and sad about having an open investigation with DCFS. The social worker reminded the court that when E.G. first disclosed the sexual abuse, she felt Mother did not believe her. She expressed fear of being in trouble and she did not want to separate her family. E.G. had also reported that when Luz told Mother about the sexual abuse, Mother appeared upset that E.G. was saying Erick C. molested her, so she denied everything. Mother and maternal relatives continued to appear doubtful of E.G.'s statements, question E.G., and discuss the allegations.

16

DCFS opined that Mother and the maternal family's repeated questioning of E.G. "may have actually developed a false memory or belief. Most concerning, is that the family's actions are emotionally and psychologically affecting [E.G.] further. It is strongly recommended that [M]other and maternal family be admonished for discussing and questioning" E.G. (Boldface omitted.)

## IV. *Adjudication Hearing*

At the adjudication hearing in April 2024, E.G. testified Erick C. had not sexually abused her. She testified no one had promised her anything or pressured her into changing her account. E.G. testified that Mother had been disappointed in her and sad when she reported the abuse. E.G. felt Mother had protected her after she found out about the abuse allegation.

E.G. testified she made the allegations against Erick C. because she was upset with him. The court asked what she was upset about. E.G. responded by describing herself in terms similar to those used by E.G.'s family and Erick C.: a spoiled brat with an attitude who tried to control her parents and take advantage of them. She concluded by saying Erick C. had said she could not attend a certain middle school, "So I was upset because he would not say yes to anything because it was— because I was angry and would take advantage." She testified that it was after this argument that she reported to her school counselor that Erick C. had abused her. E.G. denied recanting because she felt bad about what had happened to her family.

Counsel for Mother and for Erick C. requested the petition be dismissed. Minor's counsel acknowledged the difficulty of determining what happened to E.G. and why she recanted, but noted the evidence and timeline, as well as the consistency in her

17

accounts of the abuse, made her initial accusations more likely to be true. DCFS argued the sexual abuse allegations in the petition should be sustained in their entirety.

The juvenile court amended and sustained the sexual abuse allegations under all three subdivisions alleged in the petition. The court explained its reasoning at length: "[R]ecantation is not uncommon. Often times the youthful victims will regret making these allegations in the first place because of the consequences it has on disrupting the family unit, on exacerbat[ing] already strained economic circumstances. And sometimes youth have a sense of remorse or guilt or betrayal towards their parent. [¶] The facts of this case are that—in seeking for a motive, searching for a motive, there is really not compelling evidence that [E.G] had such a motive to manufacture these allegations. [¶] The first person she confided in was her best friend, Luz, someone she trusted.·Someone that she was close enough to share this with, also, was her counselor. [¶] What was quite revealing to the court was her comments in the forensic interview that she was mad. She got mad at the counselor for, maybe in her view, breaching her confidentiality and making a report to the authorities. This was something that at this time was the motive for her and was more to seek assistance in handling—in dealing with her allegation of sexual molestation. The motivation in the court's view was not to penalize the stepfather for something he had done, but for her to be able to express in a therapeutic setting how it impacted her. [¶] I looked closely at the child's demeanor and responses to the questions. Her responses were thoughtful and did not appear to the court to be rehearsed or expressed in a rote ma[nn]er. When asked a question, she would actually think about it and then provide her response. If the motivation was to

18

get back at her stepfather for something he had done to her, the court believes that she would have gone directly to the police or the authorities or her mother for that. And so it comes down to whether or not it is more likely than not that the allegation of sexual misconduct by the stepfather is true. [¶] Based upon the minor's demeanor, her consistency—overall consistency in the specifics, for the most part there are slight discrepancies. But for the most part, her recollection, description of the events, were consistent. I am sure she regrets having made the initial allegation. But she did so because it was bothering her. And clearly bothering her, [as] she was engaging in self-harm. [¶] And so the court finds that it is more likely than not that the allegations that she made were true. And that her subsequent recantation was the result of the impact it had on splitting this family up, on putting her mother in a difficult situation."

The court declared the children dependents of the juvenile court, removed them from Erick C., and released them to Mother. Erick C. appealed. In November 2024, the juvenile court terminated jurisdiction with an exit order granting Mother and Erick C. joint physical and legal custody of the children.

## DISCUSSION

We previously granted Erick C.'s request to take judicial notice of the orders terminating jurisdiction and determining custody. On behalf of DCFS, County Counsel declined to argue the appeal is moot, and at Erick C.'s unopposed request we exercise our discretion to adjudicate the appeal on the merits due to the gravity and stigma of the jurisdictional findings. (*In re D.P.* (2023) 14 Cal.5th 266, 285–287.)

19

In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings and related dispositional orders, we examine the record in the light most favorable to the findings and conclusions of the juvenile court and defer to the juvenile court on issues of credibility of the evidence and witnesses. (*In re R.T.* (2017) 3 Cal.5th 622, 633 (*R.T.*).) We " ' "do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) We uphold the juvenile court's findings unless they are " ' "so lacking in evidentiary support as to render them unreasonable." ' " (*Jamieson v. City Council of the City of Carpinteria* (2012) 204 Cal.App.4th 755, 763.) If there is substantial evidence to support the court's order, we must uphold it even if other evidence supports a contrary conclusion. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.) "The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order." (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 138.)

## I. *Jurisdictional Findings Concerning All Children*

Erick C. contends there was no substantial evidence to support the jurisdictional findings as to E.G. because she was not sexually abused, and therefore there was no substantial evidence to support the findings that the abuse of E.G. placed her younger siblings at substantial risk of serious physical harm.

The evidence is unquestionably sufficient to support the court's findings. E.G. gave a largely consistent, detailed report of Erick C.'s sexual abuse to at least six people over a series of many months. She later recanted, but there is abundant evidence in the record from which the juvenile court very reasonably

20

determined it was her recantation, not her original account, that lacked credibility: her family did not believe her allegations and exerted pressure on her to recant, including telling her she could be taken away by DCFS and implanting the idea that the sexual abuse was just a dream. E.G. also gave inconsistent reasons for recanting, at one point saying the abuse was a dream and at another point saying she was angry at Erick C. Her anger explanation, moreover, could not be reconciled with her disclosure of the abuse to her friend months before she reported the abuse to her counselor out of alleged anger. The court described its reasons for its credibility determination in detail, and we defer to its determination of the credibility of both the evidence and the witnesses. (*R.T.*, *supra*, 3 Cal.5th at p. 633.)

Erick C.'s argument that the evidence was not sufficient to support the findings boils down to a contention that the juvenile court should have weighed the evidence differently. He notes E.G. admitted a history of lying, had experienced hallucinations, did not believe her siblings were at risk, did not want to speak with a social worker originally, did not say she wanted Erick C. to leave permanently, later recanted, and denied anyone had pressured her to recant or made her feel bad. He points out inconsistencies in E.G.'s accounts, such as variations in the dates given for the assaults and how many times she was raped versus groped. He argues E.G.'s description of being penetrated vaginally and anally at a young age lack credibility because she denied feeling pain. He points out that E.G. recanted her allegations and said she had been angry at Erick C. Erick C. also disagrees with the court's conclusion that the evidence was "not compelling" that E.G. had a motive to manufacture the allegations against Erick C., directing us to evidence in the

21

record of hostility between E.G. and Erick C. Finally, he directs our attention to the evidence that members of E.G.'s maternal family said they had not seen Erick C. act in a way that would raise concerns of abuse and that E.G.'s behavior had not changed during the time period the abuse had occurred.

These arguments demonstrate the juvenile court could have resolved the evidentiary and credibility conflicts differently, but they do not show there was no substantial evidence to support the findings. The court was entitled to believe the evidence supporting the findings and to give greater weight to E.G.'s repeated, detailed descriptions of abuse than to her recantation after months of family pressure. We decline Erick C.'s invitation to reweigh the evidence and substitute our judgment for that of the juvenile court.

II.   *Arguments Concerning Siblings Only*

Erick C. presents additional arguments challenging the jurisdictional findings concerning the younger children, I.G. and K.G., on the abuse of sibling count under section 300, subdivision (j), but the arguments are difficult to parse. First, he correctly observes that section 300, subdivision (j) directs the court to "consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent, and any other factors the court considers probative in determining whether there is a substantial risk to the child." He then states, "[I]n examining the age and gender of the affected children, I.G. and K.G. had not experience[d] or witnessed any inappropriate touching in the family home." Erick C. does not explain how not witnessing sexual abuse relates to age and gender. He instead cites, without explanation, two cases in

22

which the court found a substantial risk of harm to one sibling when they were present during the sexual abuse of another sibling. To the extent Erick C. intends to argue these cases establish the siblings were not placed at risk because they had not experienced or witnessed any inappropriate touching in the family home, that would be a logical fallacy—the fact that some courts have found a substantial risk of harm when a child was in the same room as the sibling at the time of the abuse does not mean that if the children were *not* in the same room when the abuse occurred, they were *not* at substantial risk of harm.

Next, Erick C. accurately sets forth the standard set by the California Supreme Court in *I.J.*. *supra*, 56 Cal.4th at page 778 for determining whether abuse of one child supports dependency jurisdiction over siblings. The Court wrote, "Among the factors cited in [section 300,] subdivision (j) for the court to consider are the circumstances surrounding, and the nature of, father's sexual abuse of his daughter. By citing these factors, subdivision (j) implies that the more egregious the abuse, the more appropriate for the juvenile court to assume jurisdiction over the siblings. (§ 300, subd. (j).) 'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . . Conversely, a relatively high probability that a very minor harm will occur probably does not involve a "substantial" risk. Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm . . . .' [Citation.] In other words, the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is

relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*Id.* at p. 778.)

Erick C. then states the siblings denied seeing inappropriate conduct by Erick C. with E.G., they were comfortable disclosing that their parents physically disciplined them, and the juvenile court allowed Mother to monitor Erick C.'s visits with the children; he concludes there was no substantial evidence that the siblings were at risk at the time of the jurisdiction hearing. We are at a loss to understand how these factors establish an absence of risk, or how they relate to the case law that preceded them. Presumably, Erick C. intends to suggest these factors tended to establish that there was a low probability of harm to the siblings, although he does not make any such argument explicitly.

While not identical in their facts, both this case and *I.J.* involve digital penetration and rape of a child, and both assess the risk to siblings present in the home during the abuse. Like the *I.J.* Court, we find the sexual abuse " 'aberrant in the extreme.' " (*I.J.*, *supra*, 56 Cal.4th at p. 778.) "Also relevant to the totality of the circumstances surrounding the sibling abuse is the violation of trust shown by sexually abusing one child while the other children were living in the same home and could easily have learned of or even interrupted the abuse. '[S]exual or other serious physical abuse of a child by an adult constitutes a fundamental betrayal of the appropriate relationship between the generations. . . . When a parent abuses his or her own child, . . . the parent also abandons and contravenes the parental role. Such misparenting is among the specific compelling

24

circumstances which may justify state intervention, including an interruption of parental custody.' " (*Ibid*.)  The serious and repeated abuse of E.G. under these circumstances supports the juvenile court's finding that the risk of abuse was substantial as to all the children.

## DISPOSITION

The judgment is affirmed.

STRATTON, P. J.

We concur:

WILEY, J.

MATTHEWS, J.*

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 7/1/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re E.G. et al., Persons Coming Under the Juvenile Court Law. | B338002 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>ERICK C.,<br><br>　　Defendant and Appellant. | (Los Angeles County Super. Ct. No. 23CCJP03814A–C)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT |

THE COURT:

The opinion in the above-entitled matter filed on June 10, 2025, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

There is no change in the judgment.

_____

STRATTON, P. J.　　　　　　WILEY, J.　　　　　　MATTHEWS, J.*

_____

\*　　Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.